EISMANN, Justice.
This is an appeal from a judgment in favor of the defendants in an action alleging fraud and breach of contract in connection with the sale of a commercial building. We affirm the judgment of the district court.
I.
Factual Background
High Mark Development, LLC, is an Idaho limited liability company whose members include Gordon Arave, Mark Arave, and Jared Arave. High Mark was the owner of a commercial building located in the City of Ammon, a suburb of Idaho Falls. On June 20, 2006, it had leased a portion of the building to The Children’s Center, Inc., for a period of ten years commencing on June 19, 2006.
In June 2007, High Mark listed the real property for sale through its realtor. Thomas O’Shea, a resident of California, learned of the property through a realtor friend in Boise. Mr. O’Shea and his wife, Anne, were trustees of the “Thomas and Anne O’Shea Trust u/d/t Dated November 2, 1998,” which they had formed to protect their assets and provide for their children. They decided to purchase the real property.
On August 14, 2007, the Trust entered into a real estate contract agreeing to purchase the property from Seller for $3,700,000.00. The remaining Plaintiffs, Grandview Credit, LLC, a California limited liability company; San Francisco Residence Club, Inc., a California corporation; Caleb Foote; Kate Donahue; and John Donahue, all agreed to invest in the property. When the transaction closed, the deed listed the Trust and the investors as grantees, taking the property as tenants in common with varying percentages of interest. The negotiations and exchange of information were conducted primarily through the Plaintiffs realtor and High *121 Mark’s realtor, with Mr. O’Shea being the spokesperson for the investors.
The sale of the real property closed on December 10, 2007. The Children’s Center did not make any payments to Plaintiffs after they acquired the property. On March 1, 2008, the Children’s Center vacated the property, and shortly thereafter it went out of business.
On July 8, 2008, Plaintiffs filed this action against High Mark and two of its principals, Gordon Arave and Benjamin Arave. Plaintiffs later added Jared Arave as a defendant by filing an amended complaint. The focus of the litigation was that the Defendants had induced the Plaintiffs to acquire the property by providing false information that the Children’s Center was current in its payments of rent and/or concealing or failing to disclose that the Center had failed to pay all rent due under the lease. The Plaintiffs alleged claims for breach of contract and fraud by misrepresentation and nondisclosure against all of the Defendants, but the issues were narrowed after cross motions for summary judgment. The case was tried to a jury on the issues of: High Mark’s breach of contract; High Mark’s alleged fraud by misrepresentation and nondisclosure; Gordon Arave’s alleged fraud by misrepresentation and nondisclosure; and Benjamin Arave’s alleged fraud by nondisclosure. The jury returned verdicts in favor of all of those Defendants. The Plaintiffs filed a motion for a judgment notwithstanding the verdict on the issue of liability or, in the alternative, for a new trial, which the district court denied. The Plaintiffs then timely appealed.
II.
Did the District Court Err in Denying the Plaintiffs Motion for a Judgment Notwithstanding the Verdict?
When a trial court decides a motion for a judgment notwithstanding the verdict, it cannot weigh the evidence or pass on the credibility of witnesses. Weinstein v. Prudential Prop. and Cas. Ins. Co., 149 Idaho 299, 327, 233 P.3d 1221, 1249 (2010). It must simply determine whether reasonable minds could have reached the same conclusion as the jury when the evidence and all reasonable inferences that can be drawn therefrom are considered in the light most favorable to the nonmoving party. Id. We use that same standard when reviewing the trial court’s ruling on the motion. Id. at 315, 233 P.3d at 1237.
A.
The Fraud Claim.
1. False Statement. The jury was asked to decide whether the Plaintiffs had proved, by clear and convincing evidence, that High Mark had committed fraud, either by misrepresentation or by failure to disclose; that Gordon Arave had committed fraud, either by misrepresentation or failure to disclose; and that Benjamin Arave had committed fraud by failure to disclose. The jury found that the Plaintiffs had not proved those claims. In their motion for a judgment notwithstanding the verdict, the Plaintiffs asked for a judgment establishing liability for fraud against High Mark on the claim of fraud by both misrepresentation and nondisclosure and against Gordon Arave on the claim of fraud by nondisclosure. The district court denied that motion. In their initial brief on appeal, the Plaintiffs listed as an issue the district court’s denial of that motion. However, they only addressed their claim that High Mark committed fi’aud by making false representations. Therefore, we will not address the district court’s denial of the motion ■with respect to High Mark’s and Mr. Arave’s alleged fraud by nondisclosure. Inama v. Boise County ex rel. Bd. of Comm’rs, 138 Idaho 324, 330, 63 P.3d 450, 456 (2003) (“We will not consider issues cited on appeal that are not supported by argument and propositions of law”).
The only claim of fraud argued on appeal is High Mark’s alleged fraud in making a false representation. Under the facts shown in the record, the Thomas and Anne O’Shea Trust u/d/t Dated November 2, 1998, did not have a fraud claim based upon an alleged false representation. There were no representations that could have fraudulently induced Mr. O’Shea on behalf of the Trust to enter into the purchase contract. The only *122 alleged misrepresentations that occurred pri- or to the execution of the real estate contract were: (a) the internet posting advertising the property for sale, which was created by High Mark’s realtor, and (b) a statement by the realtor to the Plaintiffs’ realtor that, “as far as he knew,” the tenant had made all of the rental payments. In connection with the Defendants’ motion for summary judgment, the district court determined that the internet advertisement did not contain allegations of fact that could be the basis of a fraud claim, and it so instructed the jury. The court also held that the statement by High Mark’s realtor could not be a statement of fact that could be the basis of a fraud claim. The Plaintiffs have not challenged those rulings on appeal. Therefore, there was no misrepresentation that induced the Trust to enter into the real estate contract.
Alleged false representations about the financial condition of the tenant made after the Trust had entered into the contract could not form the basis of a fraud claim because the contract did not provide that the Trust could terminate it if the Trust determined that the tenant was not financially sound. The buyer could only terminate the contract “[sjhould the information provided on the estoppel differ from the information provided by Seller,” and there is no contention that it did. The Trust was already bound to purchase the property before the alleged false representations were made. “It is immaterial if one is induced by false representations to do what one is bound to do....” 37 Am.Jur.2d Fraud and Deceit § 283 (2001). However, the record does not reflect that the other Plaintiffs were contractually bound to invest in the property until they executed the Tenancy in Common Agreement dated November 15, 2007, which required them to contribute to the purchase price. That agreement was executed after an alleged misrepresentation regarding the tenant’s payment of rent. Therefore, the other Plaintiffs would have a cause of action for fraud based upon that alleged misrepresentation. However, for the sake of simplicity, when addressing the fraud claim we will refer to the Plaintiffs, even though the Trust does not have a claim of fraud based upon the making of a misrepresentation.
The district court instructed the jury that two of the elements the Plaintiffs had to prove by clear and convincing evidence in order to establish fraud were that “the defendant stated a fact to the plaintiff’ and that “[t]he statement was false.” The only alleged misrepresentations that the Plaintiffs argue on appeal were included in the Income and Expense Statement faxed to their realtor on August 27, 2007, and the Estoppel Certificate dated October 17, 2007. The Plaintiffs contend that these documents “falsely represented that the Center had been paying all of its monthly rent.”
The Income and Expense Statement showed that from June 2006 through July 2007, the rent received from the Children’s Center totaled $324,836.00. The Estoppel Certificate included a statement that “[a]ll minimum monthly rent has been paid to the end of the current calendar month, which is September 2007.” The Plaintiffs contend that these statements were false because the Center’s records show that it did not make rental payments during the six-month period from August 2006 through January 2007. From the evidence at trial, the jury could reasonably have concluded that there was no false statement regarding the Center’s payment of rent.
In 2002, the Children’s Center began its business of providing psychiatric, psychological, counseling, and therapy services to children and adolescents. It leased space in a building located at 1615 Curlew Drive, Ammon, which was owned by Arave Brothers, LLC, a company owned by Gordon Arave and his brother. Because the Center was a new business, Arave Brothers agreed that it did not have to pay any rent for the first six months of the lease. Arave Brothers later sold the building to a third party, subject to the Center’s lease, and the Center continued occupying that building for the duration of the lease.
The Children’s Center wanted to expand its business, and in 2004 it discussed with Gordon Arave a proposal to have a new building constructed in Pocatello. Gordon Arave agreed to do so, and Arave Construction, Inc., purchased a parcel of land near the *123 hospital, built a building, and sold it to Crest-wood Enterprises, LLC, a company in which Gordon Arave is a part owner. The Center began leasing space in that building on May 1, 2005, and Crestwood Enterprises agreed that the Center would not have to pay rent for the first six months because it was expanding into a new market.
On June 1, 2005, Gordon Arave loaned M. Smith Enterprises, LLC, a company owned by the Center’s CEO, the sum of $100,000, in exchange for a promissory note payable in monthly interest-only payments until June 1, 2010, when the balance was to be paid. On October 1, 2005, Mr. Arave made another $100,000 loan to Smith Enterprises on like terms in exchange for a promissory note with the balloon payment being due on October 1, 2010.
In 2005, the Children’s Center was nearing the end of its five-year lease on the building in Ammon. It discussed with Gordon Arave about constructing a new building for it to lease. Arave Construction agreed to construct a building on adjoining property at 1675 Curlew Drive. When the building was completed, it sold the property to High Mark Development, LLC.
The Children’s Center began leasing the building on June 19, 2006. After it had moved in, it contacted Mr. Arave in July or August 2006[1] and asked if it could have the same concession as the other two leases — six months of free rent. Mr. Arave and his accountant then met with the Center to discuss the request and to review some of its financial information. The accountant was impressed with the Center’s business model and felt its business was growing. Mr. Arave stated that he would not agree to six months of free rent because High Mark did not have enough money on hand to do that. High Mark needed to make the mortgage payments on the property. The Center then asked if six-month’s rent could be deferred and paid over a period of seven years. Within a few days, Gordon Arave and Jared Arave agreed to loan the Center money for six month’s rent plus an additional $49,975.00 from a business they had together, which was apparently Arave Livestock. As Gordon Arave testified:
And ultimately we did have some money in another company, meaning Jared and I. We opted to loan that money to Matt Smith or to The Children’s Center, I guess is the appropriate answer, to The Children’s Center so that they could meet them rental obligations. Same thing as borrowing from a bank, I guess, the Bank of Commerce. We made a loan to them to do that with.
It appears that the loan proceeds for the rent were remitted directly to Seller rather than to Tenant. When called as a witness by Plaintiffs, Gordon Arave testified:
A. High Mark Development did not accept a promissory note. Gordon and Jared Arave accepted a promissory note after having made a loan to The Children’s Center to make those payments; that’s correct.
Q. Well, the payments weren’t made.
A. Well, do you suppose that High Mark Development could make their payments without any money?
Q. Well, I’m asking you—
A. Someone had to give them that money.
The Children’s Center was to prepare and sign the promissory note, but it did not provide the signed note until April 18, 2007. The note was made payable to Gordon Arave and Jared Arave, not to High Mark. If the note was simply to evidence the debt for the unpaid rent and to establish terms for the payment of that rent, it would have been made payable to High Mark because it was High Mark that was owed the rental payments. Thus, the jury could have found that the Center did not fail to pay six month’s rent. It borrowed money from Gordon Arave and Jared Arave to pay that rent. That the money for the rent was not paid to *124 the Center so it could pay High Mark does not mean that the transaction was not a loan. When one borrows money to pay a specific obligation, it is common for a lender to remit the loan proceeds directly to the creditor rather than to the borrower.
The Income and Expense Statement stated that “Rent Received from 6/2006 through 7/2007” was $324,836.00. It did not make any representation as to the source of the funds used to pay the rent. The Estoppel Certificate stated that “[t]he Lease ... has not been ... altered or amended in any respect (except as indicated in the following sentence)____” and that “[a]ll minimum monthly rent has been paid to the end of the current calendar month, which is September 2007____” It also did not represent the source of the funds used to pay the rent, and Gordon and Jared Arave’s agreement to loan the Children’s Center the funds to pay the rent did not constitute an alteration or amendment of the lease. Thus, there was sufficient evidence from which reasonable jurors could have concluded that the statements in the Income and Expense Statement and the Estoppel Certificate were truthful.
The Defendants’ attorney did not argue to the jury the significance of Gordon Arave’s testimony regarding him and Jared Arave making a loan to the Children’s Center so it could meet its rental obligations. However, a jury is not bound to consider only the arguments made by counsel. The district court instructed the jury at the beginning of the trial, “Your duties are to determine the facts, to apply the law set forth in these instructions to those facts, and in this way decide the case.” The jury is not limited by counsel’s understanding of the ease, of the evidence, or of the law. It can determine the facts for itself and then apply them to the law as stated in the court’s jury instructions in order to reach its verdict.[2]
2. Causation. The Defendants’ counsel did not argue that the statements concerning the payment of rent were accurate. However, he did argue that under the evidence presented a reasonable jury could have found that the alleged misrepresentations did not cause the Plaintiffs any damages, and the disti’ict court agreed. The court had instructed the jury that the Plaintiffs were required to prove by clear and convincing evidence that they “suffered damages proximately caused by reliance on the false statement.” Based upon the evidence in the z’ecord, the juzy could z’easonably have found that the Plaintiffs failed to prove that their damages were caused by any repz’esentations in the Income and Expense Statement or the Estoppel Certificate, even if they were false.
The jury could reasonably have concluded that the Plaintiffs’ actions showed that they would have purchased the propei'ty even had they known that the tenant did not pay rent from August 2006 through Januazy 2007, assuming that it had not. After Mr. O’Shea learned that the propez’ty was for sale, he saw the internet advez’tisement and the website of the tenant. On August 7, 2007, Mr. O’Shea’s realtor friend e-mailed High Mark’s z’ealtor stating that the trust would like to make an offer on the property. He stated in the email, “The family trust will be an all cash purchase and can close in 30 days.”
On August 14, 2007, Mr. O’Shea signed the contz’act for the tz-ust to purchase the property without ever having seen the property or having made an investigation into the financial condition of the tenant. There was no provision in the conti'act making the buyer’s obligation to purchase contingent upon the buyer being satisfied with the financial condition of the tenant. During tidal, Mr. O’Shea testified that he would have liked to ask the tenant some questions such as “how long he’s been in business and how his operation was doing and how he saw the future of the operation,” but he made no attempt to contact the tenant to obtain that information, even though he had the tenant’s telephone number from the tenant’s website.
The contract pz-ovided that High Maz’k was to provide “2005 and 2006 fedezal tax returns *125 of tenant and a current balance sheet showing assets and liabilities.” In late August 2007, the Plaintiffs’ realtor was provided with copies of the Children’s Center’s 2005 and 2006 federal and state income tax returns and a profit and loss statement for the Center covering the period from January 1 through June 7, 2007. The realtor only forwarded to Mr. O’Shea copies of two pages of each year’s tax returns. They were the page showing total income and the page showing expenses, which was probably the schedule of “Other Deductions.” Those documents showed that in 2005, the Center had total income of $4,228,949 and total deductions (excluding depreciation) of $3,938,412, for a net gain of $290,537. It was then able to take a net operating loss carried forward from a prior year in the sum of $165,908. In 2006, the Center had total income of $5,817,303 and total deductions (excluding depreciation) of $6,183,462, for a net loss of $366,159. The profit and loss statement for the first six months of 2007 showed total income of $2,643,751.34, total expenses of $2,654,572.04, for a net loss of $10,820.70.
Mr. O’Shea testified that there was “some concerns” about the loss in 2006, but their realtor informed them that the Children’s Center was expanding its business, it had moved into a new building, and it was hiring additional doctors and staff. They considered these very legitimate reasons for the high expenses in 2006. Mr. O’Shea also testified that he did not consider the loss in 2006 significant, but he put great significance upon the fact that during the first six months of 2007 the Center’s loss had dropped to only about $10,000.
The Plaintiffs did not make any inquiry about the Children’s Center’s long-term debt, nor did they inquire as to its sources of income. They did not inquire as to how in 2006 it was able to pay out $366,159 more in expenses than it received in income.
Jack Chillemi, the manager of Grandview, LLC, testified that the Plaintiffs thought the Center had “got over the expense hump,” and the Plaintiffs’ realtor, who consulted with the Plaintiffs, stated that they saw that the Center had “righted the ship.” Mr. O’Shea also testified that the income tax returns showed that the Center was a growing business because its gross income had grown by almost forty percent from 2005 to 2006.
The jury could have concluded from the evidence that the other Plaintiffs relied heavily upon Mr. O’Shea in deciding to invest in the property. The O’Sheas were experienced in buying and selling commercial real estate. Kate Donahue and Mrs. O’Shea are sisters. Ms. Donahue’s personal investment was to complete a Section 1031 exchange. She and her brother, John Kevin Donahue, were also officers of the San Francisco Residence Club, Inc. She testified that she relied upon Mr. O’Shea in making her investment decision. Mr. Donahue testified that he did not review many of the documents provided and was not involved in the transaction. Caleb Foote testified that Mr. and Mrs. O’Shea were very good friends of his, that he was not involved with a lot of the specifics, and that he trusted the O’Sheas implicitly, which was a huge factor in his decision to join the investment group. Jack Chillemi, the manager of Grandview Credit, testified that Mr. O’Shea was one of his closest friends, that he relied upon Mr. O’Shea to accumulate a lot of the information, and that it was a group decision to go ahead with the investment. Kate Donahue also testified that it was a group decision to go ahead with the investment. Mr. O’Shea did not provide the other Plaintiffs with all of the documents he obtained, but only gave them the documents he believed they needed.
The jury could reasonably have concluded that the O’Sheas had an incentive to use their influence to convince the other Plaintiffs to invest in the property so that this transaction could be completed. They had sold some commercial properties in 2007 and wanted to complete a Section 1031 exchange in order to avoid paying about $400,000 in income taxes. To do so, they were required to identify like-kind property to purchase within forty-five days and to complete the purchase within the following 180 days. Thomas O’Shea was looking for commercial property to purchase in Idaho, when his realtor friend informed him of the High Mark property that was for sale. The real estate contract stated that the buyer “intends to use the purchase and sale *126 of the Premises as an integral part of a tax deferred like-kind exchange as allowed under Section 1031 of the Internal Revenue Code.” The closing date was to be “no later than September 15, 2007.”
The contract also provided that the purchase price would be paid-in cash, and it was not contingent upon the buyer obtaining financing. The evidence indicates that the O’Sheas needed the investors in order to obtain the financing to complete the purchase. Without them, they would not have been able to do so.
The closing date was later extended several times. There were two main issues raised by the Plaintiffs regarding the estoppel certificates. There were several versions of the certificates before the one dated October 17, 2007, and Gordon Arave did not see any of them, including the final one. They were drafted by the Plaintiffs’ lawyer and by High Mark’s lawyer.
Mr. O’Shea was concerned that the lease was ambiguous as to the property management expenses to be borne by the Children’s Center. Mr. O’Shea demanded that the estoppel certificate specifically include certain expenses that the Center was to pay, and the Center objected that doing so was modifying the lease. The Plaintiffs, through them realtor, also expressed concern over the Center’s option to purchase the property contained in the lease. The purchase price was to be determined by an appraisal, and the Plaintiffs were concerned that if the Center exercised the option, the Plaintiffs could be required to sell the property for less than they had paid for it. In an addendum to the real estate contract, High Mark and Gordon Arave agreed to indemnify the Plaintiffs from any loss if the Center attempted to exercise its option. On September 19, 2007, Mr. O’Shea accepted the terms of that indemnification, but by letter dated October 12, 2007, the Plaintiffs’ realtor informed High Mark’s realtor: “[Ojne of the parties that agreed to partner with Tom O’Shea pulled out. The reason stated was that they could not reconcile the issue with the Tenant’s option to purchase the building.” During the trial, the realtor conceded the statement was false and stated that he was just trying to get the process moving. However, High Mark did not know it was a false statement. The realtor also informed High Mark’s realtor that Mr. O’Shea was still attempting to arrange financing, and that one financing option may require Gordon Arave to loan Mr. O’Shea $300,000 on a short-term note. The letter added that “this is a 1031 Exchange for Tom and the clock is ticking.”
On October 18, 2007, the Children’s Center and High Mark agreed to resolve these issues. The Center also had an option to purchase the Pocatello property that it was leasing. The expansion into Pocatello had not been successful and it was centralizing its business in the Ammon facility. High Mark wanted the Center to relinquish both options to purchase. The Center agreed that it would release both options, that it would sign the estoppel certificate that included the language required by Mr. O’Shea concerning the payment of specified expenses, and that it would sign a new promissory note to change the payment schedule of the October 1, 2005, promissory note. In exchange, Gordon Arave and Jared Arave agreed to release the Center from its obligation to pay the promissory note dated April 18, 2007, in the sum of $199,900.00.
The relevance of the nonpayment of rent was what it indicated about the Center’s financial condition. A reasonable jury could have concluded that had the Plaintiffs been told that the Center was unable to pay rent from August 2006 through January 2007, they would still have purchased the property. The Plaintiffs were not concerned about the Center’s inability to pay over $366,000 of its operating expenses in 2006 because it appeared that the Center was now doing well financially. Their concern was not whether the Center had paid its debts in the past, but whether it appeared it could pay them in the future, and they concluded that it did. Because its financial difficulties were sufficiently explained, it now appeared that the Center would be earning a profit. The jury could reasonably conclude that Plaintiffs failed to prove by clear and convincing evidence that they would not have purchased the property had they known of the nonpayment of the rent (assuming it occurred).
*127 The jury could also have found that the Children’s Center’s ultimate failure was not due to any financial condition that existed when Mr. O’Shea signed the contract. The Center ceased operations in August or September 2008, about a year after Mr. O’Shea signed the contract. The cause was twofold: a decision made by the Idaho Board of Medicine that the Center could not employ physicians and a reduction in Medicaid funding.
The Center had employed psychiatrists and a pediatric neurologist, and a significant portion of its profit was the amount by which the Medicaid reimbursement received for their services exceeded what it had to pay those physicians. Eventually, the Idaho Board of Medicine investigated and informed the Center that it could not employ physicians. Only hospitals or managed care facilities could do so. The physicians would have to be independent contractors, which meant that they would bill Medicaid and receive the Medicaid monies, not the Center. The person who was the Center’s attorney when this occurred testified that it was “a big precipitating factor” in the Center going out of business.
The other factor was a reduction in Medicaid funding that began sometime in 2007. Medicaid began reducing the number of hours it would pay for services provided by the psychological rehabilitation workers, and it also reduced payments for intensive behavioral intervention (IBI). The Medicaid reimbursement was eventually reduced to the point that the Center had to close its IBI Department and lay off the IBI workers. A large number of the parents whose children were seen at the Center could not pay for the treatment themselves, and they did not have private health insurance that would pay. The Medicaid cutbacks significantly reduced the Center’s revenues.
Thus, assuming that the jury found that High Mark had misrepresented the lease payments made by the Children’s Center, it could reasonably have concluded that such misrepresentations did not cause the Plaintiffs’ damages. Even had they known of the missed payments, they would have still purchased the property because it appeared to them that the Center had overcome its financial difficulties. Ultimately, the Center’s closing was caused by two unanticipated events: the decision by the Idaho Board of Medicine that it could not employ physicians and a cutback in Medicaid reimbursements.
In summary, the jury could reasonably have found that there was no misrepresentation or that the Plaintiffs failed to prove that they had been damaged by the misrepresentations. Therefore, the district court did not err in denying the motion for a judgment notwithstanding the verdict on the fraud claim.
The dissent contends that the Plaintiffs raised the issue of fraud by failing to disclose that the Children’s Center did not pay its rent in October, November, and December 2007. In doing so, the dissent fails to disclose certain material facts. First, it quotes from pages 22-23 of the Plaintiffs’ opening brief. That argument was in support of the Plaintiffs assertion, “Even if Appellants had conducted their own investigation, the Court erred because it did not determine whether the records, had they been reviewed, actually disclosed the inaccuracy of the representations.” (Appellants’ Opening Brief, p. 20.) The first sentence of the quoted argument states, “None of these documents ‘diselose[d] the inaccuracy of the representation[s]’ that the Center had regularly paid its rent and was current.” The documents to which the Plaintiffs referred were “a copy of the Center’s current balance sheet [dated August 28, 2007] showing an outstanding loan obligation of Gordon Arave, as well as other liabilities” and “the Center’s 2005 and 2006 tax returns and a 2007 profit and loss statement, showing ‘financial trouble.’ ” (Appellants’ Opening Brief, p. 22.) Those documents were all sent to the Plaintiffs in August 2007,[3] and they did not purport to represent whether the Center had paid rent in October, November, or December 2007. The argument being made was that the documents did not disclose the Center’s alleged nonpayment of rent during the period from August 2006 through January 2007. During this portion of the argument, there was no mention of the failure to *128 disclose nonpayment of rent in October, November, or December 2007.
The dissent then refers to pages 28 and 33 of the Plaintiffs’ opening brief. In that portion of the Plaintiffs’ brief, they were arguing, “The District Court erred as a matter of law by denying the Appellants’ Motion for Partial Summary Judgment.” (Appellants’ Opening Brief, p. 28.) After first arguing that this Court should overrule its prior decisions and review on appeal the denial of a motion for summary judgment, the Plaintiffs stated that the district court erred in denying the Plaintiffs’ motion for partial summary judgment because “[a]t summary judgment, the District Court erred in its analysis of fraud by nondisclosure by failing to look at every circumstance under which a duty to disclose exists.” (Appellants’ Opening Brief, p. 33.) In this portion of its argument as to why the district court erred in failing to grant partial summary judgment, the Plaintiffs stated that the duty to disclose included “the November 7, 2007 promissory note, signed after the Estoppel Certificate had been provided to Appellants.” (Appellants’ Opening Brief, p. 34.) The Center gave the November 7, 2007, promissory note for the October and November 2007 rent. This reference was to support the Plaintiffs’ assertion that the district court erred in not granting their motion for partial summary judgment, not that it erred in failing to grant a judgment notwithstanding the verdict or a new trial. This is the only portion of their brief in which the Plaintiffs argue any error based upon the November 7, 2007, promissory note or the nonpayment of rent in October, November, or December 2007.
Even if we considered that the argument in this portion of the brief regarding the district court’s denial of their motion for summary judgment should be considered as an argument in support of their motion for a judgment notwithstanding the verdict or a new trial, their argument would still fail. Their argument was: “This ‘subsequent information’ made High Mark’s previous representation ‘untrue or misleading.’ High Mark also had a duty to disclose that ‘all minimum monthly rent’ had in fact not been paid, in order ‘to prevent a partial or ambiguous statement of fact from becoming misleading.’” (Appellants’ Opening Brief, p. 34.) The previous representation to which Plaintiffs referred was the Estoppel Certificate dated October 17, 2007, in which the Children’s Center stated, “All minimum monthly rent has been paid to the end of the current calendar month, which is September 2007.” The Center’s nonpayment of rent in October, November, or December 2007, was not subsequent information showing false or misleading the Center’s statement that all monthly rent had been paid through September 2007. Thus, even if we restructured the Plaintiffs’ brief to change their argument in support of the alleged error in denying their motion for partial summary judgment so that it was in support of the alleged error in denying their motion for a judgment notwithstanding the verdict or a new trial, the argument would fail. The Estoppel Certificate did not purport to represent the future conduct of the Center.
Finally, the dissent states that “on pages 35-37 of their opening brief, Plaintiffs engage in a discussion of fraud by nondisclosure, the duty to disclose, and why they believe the instruction given by the district court on this issue was inadequate under the circumstances of their case.” In this portion of the Plaintiffs’ brief, they were asserting that Instruction No. 34 given by the district court was inadequate. The Plaintiffs’ quoted the jury instruction given by the district court, referred to an earlier quotation from Watts v. Krebs,[4] and then stated that “the *129 Instruction did not completely discuss every situation in which a duty to disclose exists, as set forth in Watts v. Krebs, 131 Idaho 616, 962 P.2d 387 (1998) and Sowards v. Rathbun, 134 Idaho 702, 8 P.3d 1245 (2000),” without identifying any of those situations. More importantly, the Plaintiffs did not mention any of the facts in this case, nor do they even mention a single fact that any of the Defendants allegedly failed to disclose. Simply quoting general statements of the law and hoping the Court will search the record for facts that may be applicable to those general statements could hardly be considered an argument as to why the facts were insufficient to support the jury verdict.
The dissent does not apply the correct standard of review. The issue is whether there is substantial and competent evidence to support the jury’s verdict. Pines Grazing Ass’n, Inc. v. Flying Joseph Ranch, LLC, 151 Idaho 924, 931, 265 P.3d 1136, 1143 (2011). It is not whether there was substantial and competent evidence for the jury to return a different verdict, or what verdict the dissent would have reached as the trier of fact. The evidence must be construed in a light most favorable to the party who prevailed at the tidal, not the losing party. Id.
B.
Breach of Contract Claim.
The district court granted partial summary judgment on the breach of contract claim, based upon the implied covenant of good faith and fair dealing. The contract provided: “Estoppels: Seller shall deliver to Buyer and [sic] estoppel for the Tenant 10 days prior to Closing. Should the information provided on the estoppel differ from the information provided by Seller, Buyer shall have the option to terminate the Agreement and receive full refund of Earnest Money.” The court found, based upon the evidence presented in connection with the summary judgment proceedings, that “representations in the Certificate to the effect that there had been no modifications to the Lease and that all rent had been paid were inaccurate,” which constituted a breach of the implied covenant of good faith and fair dealing. However, it held that the jury must decide whether such breach was a proximate cause of any damages.
The court’s finding of breach of contract was not based upon the same evidence presented at trial. In defense to the Plaintiffs’ motion for summary judgment, the Defendants’ counsel did not present to the district court the evidence set forth above regarding the loan from Gordon and Jared Arave to the Children’s Center for the rental payments. The Defendants’ counsel also did not argue the doctrine of merger as a bar to a breach of contract claim. See Estes v. Barry, 132 Idaho 82, 967 P.2d 284 (1998). There is also no indication in the record that the O’Sheas assigned any breach of contract claim to the other Plaintiffs.
With respect to the breach of contract claim, the district court instructed the jury as follows:
Plaintiffs have alleged breach of contract against Defendant High Mark Development, LLC. The Court has previously found that the Commereial/Investment Real Estate Purchase and Sale Agreement was a contract between Defendant High Mark Development, LLC and Plaintiff O’Shea Family Trust. The Court also previously found that the Lease Estoppel Certificate did not contain accurate information, that is, representations that the Lease had not been modified, supplemented, altered or amended, and representations that all minimum monthly rent had been paid, were not accurate and were therefore a breach of the implied covenant of good faith and fair dealing and breach of contract.
*130 It also instructed the jury that the Plaintiffs have the burden of proving that they “have been damaged on account of the breach” and “[t]he amount of the damages.”
The district court held that the jury could reasonably have determined that the Plaintiffs failed to prove that they were damaged by the breach. For the same reasons set forth above regarding the fraud claim, the jury could also reasonably have found that the Plaintiffs failed to prove that the breach of contract caused any damages. In addition, the jury could have found that the breach did not cause any damages because the Plaintiffs did not have the right to terminate the contract for the misrepresentation in the estoppel certificate. They could only terminate the contract “[sjhould the information provided on the estoppel differ from the information provided by Seller,” and it did not. Therefore, the district court did not err in denying the motion for a judgment notwithstanding the verdict on the breach of contract claim.
III.
Did the District Court Err in Denying Buyer’s Motion for a New Trial?
The Plaintiffs moved for a new trial on both the breach of contract claim and the fraud claims on the ground of insufficiency of the evidence to justify the verdict. I.R.C.P. 59(a)(7). The district court denied the motion.
After making an assessment of the credibility of the witnesses and weighing the evidence, a trial court may grant a new trial on the ground of insufficiency of the evidence if the judge determines that the verdict is not in accord with the clear weight of the evidence and that a different result would follow a retrial. Hudelson v. Delta Int’l Mach. Corp., 142 Idaho 244, 248, 127 P.3d 147, 151 (2005).
The standard we apply when reviewing a trial court’s decision on a motion for a new trial is as follows:
When reviewing a trial judge’s grant of a new trial on appeal, this Court applies the abuse of discretion standard. A trial judge has wide discretion to grant or deny a request for a new trial, and we will not overturn the judge’s decision absent a showing of a manifest abuse of discretion. Although we will review the evidence, we primarily focus upon the process used by the trial judge in reaching his or her decision, not upon the result of that decision. The trial judge is in a far better position than we to weigh the demeanor, credibility and testimony of witnesses and the persuasiveness of all the evidence. Therefore, we do not weigh the evidence. Our inquiry is: (1) whether the trial judge correctly perceived the issue as one of discretion; (2) whether the trial judge acted within the outer boundaries of his or her discretion and consistently with the legal standards applicable to the specific available choices; and (3) whether the trial judge reached his or her decision by an exercise of reason.
Id. (citations omitted).
The Plaintiffs contend that “the District Court did not actually weigh the evidence and determine whether the verdict was against the Court’s view of the clear weight of the evidence, and whether a new trial would produce a different result.” The district court commenced its analysis by quoting the applicable standard of review from Karlson v. Harris, 140 Idaho 561, 97 P.3d 428 (2004). That quotation included the statement that “ ‘[i]f ... the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.’ ” Id. at 568, 97 P.3d at 435 (quoting from Quick v. Crane, 111 Idaho 759, 768, 727 P.2d 1187, 1196 (1986)). The court first addressed the breach of contract claim. After discussing the evidence, the court stated that the jury could reasonably have concluded that the statements made in the Estoppel Certificate were not the proximate cause of any damages. It wrote, “The jury could likewise have concluded that, by ignoring other disclosures showing financial difficulty, Plaintiffs were going to proceed with the purchase regardless of the information provided in the Estoppel in order to realize the tax benefits from a § 1031 like-kind exchange.” The court concluded its analysis by stating, “While the Court may not necessari *131 ly agree with the jury verdict, the Court does not have a ‘definite and firm conviction’ that a mistake has been made.” This statement was the equivalent to stating that the verdict was not against the clear weight of the evidence, and was so used in Quick v. Crane, 111 Idaho 759, 768, 727 P.2d 1187, 1196 (1986). The court then addressed the fraud claims and concluded that there was substantial evidence supporting the jury’s decision that the false statements did not cause injury. It is obvious that the court’s analysis of causation under the breach of contract claim would also apply to the fraud claim. Having determined that the verdict was not against the clear weight of the evidence, it was not necessary to also determine whether a different result would follow a retrial. The Plaintiffs have not shown that the district court manifestly abused its discretion by denying their motion for a new trial.
IV.
Did the District Court Err in Instructing the Jury on the Issue of Fraud by Nondisclosure?
In their amended complaint, the Plaintiffs alleged a claim of fraud by failing to disclose a material fact. Prior to trial, they submitted a jury instruction on the duty to speak, which stated as follows:
Fraud may also be established by silence where the Defendants or any one of them had a duty to speak. A duty to speak arises in situations where the parties do not deal on equal terms or where information to be conveyed is not already in possession of the other party. A duty to speak may also arise in any one of the following instances:
(a) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or
(b) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or
(e) a party knows a false representation is about to be relied upon; or
(d) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of the relationship between them or the customs of the trade or other objective circumstances would reasonably expect a disclosure of the facts.
The trial court did not give that instruction on the ground that it was covered by its other jury instruction. The court’s instruction on fraud by nondisclosure began with the following statement: “Silence may constitute fraud when a duty to disclose exists. A party is under a duty to disclose if a fact known by one party and not the other is a vital fact upon which the bargain is based.” The court also instructed the jury that nondisclosure of the vital fact had to be material, which the court defined as follows:
“Materiality” refers to the importance of the alleged disclosure or nondisclosure in determining the party’s course of action. A disclosure or nondisclosure is material if (a) a reasonable person would attach importance to its existence or nonexistence in determining a choice of action in the transaction in question, or (b) the person making the disclosure or failing to disclose knows or has reason to know that the recipient is likely to regard the matter as important in determining the choice of action, whether or not a reasonable person would so consider.
The Plaintiffs objected on the ground that the Court should list the instances in which a duty to disclose arises. He described them as follows:
And that would include duties where information to be conveyed is not already in possession of the other party, disclosure is necessary to prevent a partial or ambiguous statement from becoming misleading, subsequent information has been acquired which will make previous representation untrue or misleading, and a fact known by one party and not the other is so vital that if the mistake were mutual, contract — the contract would be avoidable — would be voidable and the party knowing that fact also knows that the other does not know it.
On appeal, the Plaintiffs contend that the instruction was erroneous because it does not *132 completely discuss every situation in which a duty to disclose exists, as set forth in Watts v. Krebs, 131 Idaho 616, 962 P.2d 387 (1998) and Sowards v. Rathbun, 134 Idaho 702, 8 P.3d 1245 (2000). Other than making this statement, the Plaintiffs do not present any argument as to why the instruction given would not adequately cover the subject. Therefore, we will not consider the alleged error. Inama v. Boise County ex rel. Bd. of Comm’rs, 138 Idaho 324, 330, 63 P.3d 450, 456 (2003) (“We will not consider issues cited on appeal that are not supported by argument and propositions of law”).
The Appellants also contend that the court’s instruction was “overbroad, complicated, and confusing” and that “the instruction required the jury to find that a fact was ‘vital,’ that the bargain was ‘based’ upon that fact, and also that the nondisclosure was ‘material.’ ” Rule 51(b) of the Idaho Rules of Civil Procedure states, “No party may assign as eiTor the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which that party objects and the grounds of the objection.” We need not consider these objections to the jury instruction because the Plaintiffs did not object on these grounds before the district court.
V.
Did the District Court Err in Denying the Plaintiffs’ Motion for Partial Summary Judgment Establishing Liability?
The Plaintiffs ask us to reverse the district court’s denial of their motion for partial summary judgment. “An order denying a motion for summary judgment is not reviewable on appeal from a final judgment.” Watson v. Idaho Falls Consol. Hosps., Inc., 111 Idaho 44, 46, 720 P.2d 632, 634 (1986).
VI.
Is Either Party Entitled to an Award of Attorney Fees on Appeal?
The Plaintiffs seek an award of attorney fees on appeal pursuant to Idaho Code section 12-120(3) and the real estate contract. They both require that the party be the prevailing party in order to be awarded attorney fees. Because the Plaintiffs have not prevailed on appeal, they are not entitled to an award of attorney fees.
The Defendants also seek an award of attorney fees on appeal pursuant to the contract and to Idaho Code section 12-120(3). We need only address the statutory basis for an award of attorney fees. It grants the prevailing party the right to recover attorney fees in any action to recover in a commercial transaction. It defines a commercial transaction as “all transactions except transactions for personal or household purposes.” I.C. § 12-120(3). The district court awarded High Mark attorney fees under this statute on the ground that the real estate contract was a commercial transaction, and the Plaintiffs have not challenged that determination on appeal.
In their amended complaint, the Plaintiffs alleged that all of the Defendants participated in the transaction and were liable for fraud. On appeal, they ask us to set aside the verdicts in favor of the Defendants who participated in the trial and to direct the district court to enter judgments against them on liability. The prevailing party is entitled to an award of attorney fees under this statute “where the action is one to recover in a commercial transaction, regardless of the proof that the commercial transaction alleged did, in fact, occur.” Garner v. Povey, 151 Idaho 462, 469, 259 P.3d 608, 615 (2011) (Citations omitted). Therefore, the Defendants are entitled to an award of attorney fees on appeal pursuant to Idaho Code section 12-120(3).
VII.
Conclusion.
We affirm the judgment of the district court. We award respondents costs on appeal, including attorney fees.
Chief Justice BURDICK and Justice HORTON concur.

. There is also evidence that the agreement was not made until early 2007, but the jury had the right to resolve conflicts in the evidence. The accountant testified he thought it was in July or August, and Mr. Arave testified that he thought it was August, but it may have been September or October of 2006. Even if it were September or October, the rent would have been paid with the loan proceeds prior to 2007.

. When instructing the jury on the breach of contract claim, the district court informed them that it “previously found that the Lease Estoppel Certificate did not contain accurate information, that is, representations that the Lease had not been modified, supplemented, altered or amended, and representations that all minimum monthly rent had been paid, were not accurate.” It did not include a similar instruction when instructing the jury on fraud.

. The Plaintiffs deny receiving the August 28, 2007, balance sheet.

. The Plaintiffs stated, "The Instruction is inconsistent with the simple elements of fraud by nondisclosure as stated in Watts v. Krebs, and quoted above.” The preceding quotation from Watts occurred in the Plaintiffs’ argument that the district court erred in failing to grant the Plaintiffs’ motion for summary judgment, wherein they quoted from Watts v. Krebs, 131 Idaho 616, 620, 962 P.2d 387, 391 (1998), as follows:
"A duty to speak arises in situations where the parties do not deal on equal terms or where information to be conveyed is not already in possession of the other party.” The Court of Appeals has summarized the elements:
A duty to disclose may arise when (a) a party to a business transaction is in a fiduciary relationship [or other similar relationship of trust and confidence] with the other party; *129 or (b) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or (c) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or (d) a party knows a false representation is about to be relied upon; or (e) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of the relationship between them or the customs of trade or other objective circumstances would reasonably expect a disclosure of the facts.