# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40012-2012

SAINT ALPHONSUS DIVERSIFIED CARE, )
INC., an Idaho nonprofit corporation, )

Plaintiff-Appellant, )

v. )

MRI ASSOCIATES, LLP., an Idaho limited )
liability partnership, )

Defendant-Respondent. )

_____ )

MRI ASSOCIATES, LLP, an Idaho limited )
liability partnership; MRI LIMITED, an )
Idaho limited partnership; and MRI )
MOBILE LIMITED, an Idaho limited )
partnership, )

Counterclaimants-Respondents, )

v. )

SAINT ALPHONSUS DIVERSIFIED CARE, )
INC., an Idaho nonprofit corporation, and )
SAINT ALPHONSUS REGIONAL )
MEDICAL CENTER, an Idaho nonprofit )
corporation, )

Counterdefendants-Appellants. )
_____ )

Boise, February 2014 Term

2014 Opinion No. 77

Filed:, August 4, 2014

Stephen W. Kenyon, Clerk

**SUBSTITUTE OPINION.  THE COURT'S PRIOR OPINION DATED JUNE 17, 2014 IS HEREBY WITHDRAWN.**

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County.  The Hon. Michael Wetherell, District Judge.

The judgment of the district court is affirmed.

Donald B. Ayer, Jones Day, Washington, D.C., argued for appellant.

Wade L. Woodard, Andersen Banducci, PLLC, Boise, argued for respondents.

_____

EISMANN, Justice.

This is an appeal out of Ada County by Saint Alphonsus Regional Medical Center from a jury verdict awarding damages totaling $52,084,513 against it for breach of contract and tortious conduct regarding MRI Associates, LLP, and its two limited partnerships that owned and operated magnetic resonance imaging scanners. The respondents also cross-appealed the $4.6 million judgment obtained by Saint Alphonsus. We affirm the judgment of the district court.

# I.
## Factual Background.

Saint Alphonsus Diversified Care, Inc.,[1] and others formed a general partnership named MRI Associates. Saint Alphonsus Regional Medical Center, Inc., a non-profit hospital, is the sole member of Saint Alphonsus Diversified Care, Inc., and for convenience both of those entities will be referred to as "Saint Alphonsus." The parties executed a written partnership agreement that was effective on April 26, 1985. The primary purpose of the partnership was to acquire and operate diagnostic and therapeutic devices, equipment, and accessories, beginning with a magnetic resonance imaging (MRI) scanner. MRI Associates and others formed two limited partnerships. One was named MRI Limited Partnership, and it owned and operated an MRI scanner located on the hospital campus of Saint Alphonsus. That limited partnership will be called "MRI Center" herein. The other limited partnership was named MRI Mobile Limited Partnership, and it owned and operated mobile MRI scanners. It will be called "MRI Mobile" herein.

For decades, a group of radiologists known as Gem State Radiologists ("Radiologists") had interpreted medical images pursuant to a contract that gave them the exclusive right to serve the radiological needs of patients of Saint Alphonsus. After the formation of MRI Associates, they interpreted MRI scans performed at MRI Center. In 1998, the Radiologists began planning to construct and operate an outpatient facility in Boise that was located away from the hospital. The proposed facility would provide a full range of medical imaging services, including MRI imaging. There were negotiations among the Radiologists, Saint Alphonsus, and MRI

---

[1] Saint Alphonsus Diversified Care, Inc., is the successor of Saint Alphonsus Magnetic Resonance, Inc., which was an original partner in MRI Associates.

Associates to have one medical imaging entity, but those negotiations were unsuccessful. There was evidence that Saint Alphonsus was negotiating against MRI Associates with the Radiologists. On July 23, 1999, the Radiologists formed Intermountain Medical Imaging, LLC, ("IMI"), and on September 1, 1999, they opened their facility.

In 1998, Saint Alphonsus began negotiating with the Radiologists to partner with them in the imaging center. On July 1, 2001, Saint Alphonsus became a member of IMI. On June 3, 2002, IMI opened another facility in Meridian ("IMI Meridian"). Finally, on February 24, 2004, Saint Alphonsus gave notice to MRI Associates that it would dissociate from the partnership effective on April 1, 2004. Under the partnership agreement, upon dissociation Saint Alphonsus could not compete with MRI Associates for a period of one year.

On October 18, 2004, Saint Alphonsus filed this action seeking to recover the value of its partnership interest from MRI Associates, and MRI Associates responded by filing a multi-count counterclaim and claims against third parties. This case was assigned to Judge McLaughlin. The third-party claims were ultimately dismissed.

The jury found Saint Alphonsus liable on all causes of action, and MRI Associates was awarded a judgment in the sum of $36.3 million. That judgment was vacated on appeal, *Saint Alphonsus Diversified Care, Inc. v. MRI Associates*, *LLP*, 148 Idaho 479, 224 P.3d 1068 (2009), and the case was remanded for further proceedings. On remand, this case was assigned to Judge Wetherell. MRI Center and MRI Mobile were joined as counterclaimants. When referred to collectively, MRI Associates, MRI Center, and MRI Mobile will be called the "MRI Entities."

The case was again tried to a jury. The district court submitted four claims for relief to the jury: breach of contract, intentional interference with a prospective economic advantage, breach of fiduciary duty, and civil conspiracy. The jury found in favor of the MRI Entities on each of the claims. Under the judgment entered by the district court, the awards under each claim for relief were in the alternative. The highest award to each of the MRI Entities was: $3,906,338 to MRI Associates; $25,828,208 to MRI Center; and $22,349,967 to MRI Mobile, which totaled $52,084,513. On its complaint, Saint Alphonsus was awarded $4.6 million against MRI Associates. Saint Alphonsus appealed, and the MRI Entities cross-appealed.

## II.
## SAINT ALPHONSUS'S ISSUES ON APPEAL

3

## A.
## Permitting joinder of MRI Center and MRI Mobile As Counterclaimants.

Saint Alphonsus commenced this action by suing MRI Associates to recover the value of its partnership interest. On May 20, 2005, MRI Associates filed a counterclaim seeking to recover damages for wrongful dissociation and breach of fiduciary duties. On March 7, 2006, MRI Associates filed an amended counterclaim adding, among others, a claim for intentional interference with prospective economic advantage. The damages being sought were primarily suffered by MRI Center and MRI Mobile. MRI Associates only received a management fee of 7.5% of the cash receipts from operations of the two limited partnerships. On December 20, 2006, MRI Associates filed a motion seeking leave to again amend its counterclaim to provide that it was suing on its own behalf and on behalf of the two limited partnerships. Saint Alphonsus objected on the ground that the two limited partnerships were distinct legal entities and that MRI Associates could not assert claims on their behalf. The motion was argued before Judge McLaughlin on January 11, 2007, and on February 6, 2007, he issued a decision granting the motion. He held that the motion was timely under the scheduling order and that MRI Associates as the general partner in the two limited partnerships could assert claims on their behalf. On March 2, 2007, MRI Associates filed its second amended counterclaim seeking to recover damages on behalf of the two limited partnerships.

On appeal, this Court held that MRI Associates could not assert claims belonging to the limited partnerships where those partnerships were not made parties to the lawsuit. *Id.* at 496-97, 224 P.3d at 1085-86. The remittitur was issued on January 13, 2010. After Judge Wetherell was appointed to preside over this case, he held a status conference with counsel for the parties on February 17, 2010. At that conference, he granted MRI Associates permission to amend its counterclaim, and on March 22, 2010, it filed its third amended counterclaim in which MRI Center and MRI Mobile were named as counterclaimants. On August 6, 2010, Saint Alphonsus moved for summary judgment dismissing the claims asserted by MRI Center and MRI Mobile on the ground that they were barred by the statute of limitations. That motion was heard on October 1, 2010. Judge Wetherell held, that under Rule 17(a) of the Idaho Rules of Civil Procedure, the amendment adding MRI Center and MRI Mobile related back to the filing of the second amended counterclaim. He found that MRI Associates had acted reasonably in relying upon the decision of Judge McLaughlin; that MRI Associates had moved to add the limited partnerships

4

as parties within a reasonable time of learning of Judge McLaughlin's mistake; and that MRI Associates had filed its second amended counterclaim before the applicable statute of limitations had run.

MRI Associates was not the real party in interest for recovering the damages sustained by MRI Center and MRI Mobile. MRI Associates's damages would only be the loss of its management fees provided in the limited partnership agreements, which would be 7.5% of the damages recoverable by the limited partnerships. Rule 17(a) provides that the claims belonging to those parties would not be dismissed "until a reasonable time has been allowed after objection" for the joinder of the real party in interest and that such joinder "shall have the same effect as if the action had been commenced in the name of the real party in interest." In *Tingley v. Harrison*, 125 Idaho 86, 867 P.2d 960 (1994), we held that relation back under Rule 17(a) requires: (a) that the joinder occur within a reasonable time after objection; (b) that there was a mistake in naming the original party; and (c) that the joinder was not made in part to circumvent the statute of limitations. *Id*. at 91-92, 867 P.2d at 965-66.

In *Tingley*, the plaintiff's personal injury action was dismissed due to the failure of his attorneys to prosecute the action. *Id.* at 88, 867 P.2d at 962. Shortly after learning of the dismissal, the plaintiff filed a petition pursuant to Chapter 7 of the Bankruptcy Reform Act, and he listed his malpractice claim in his petition. *Id.* In March 1987, he filed a malpractice action against his attorneys, which filing was after his cause of action would have been barred by the statute of limitations. *Id*. at 90, 867 P.2d at 964. On August 15, 1988, the trustee in bankruptcy filed a ratification authorizing plaintiff to bring the malpractice claim in his own name. *Id*. at 88, 867 P.2d at 962. The district court later dismissed the action based upon the running of the statute of limitations, and the plaintiff appealed. *Id.* On appeal, he contended that his claim was property of the bankruptcy estate and that under federal law the statute of limitations for the bankruptcy trustee to bring an action did not expire until April 18, 1988. *Id*. at 91, 867 P.2d at 965. However, the trustee's ratification did not occur until four months after that date. *Id.* We held that the district court did not abuse its discretion in holding that the trustee's cause of action did not relate back to the date the plaintiff filed the complaint. *Id.* at 92, 867 P.2d at 966.

In the present case, there is no contention that the statute of limitations had run regarding the claims of MRI Center and MRI Mobile when MRI Associates filed its second amended counterclaim on March 2, 2007, seeking to assert the claims of the two limited partnerships, and

Judge Wetherell found that it had not. He also found that it was reasonable for MRI Associates to rely upon Judge McLaughlin's decision that as the general partner, MRI Associates could recover the damages sustained by the limited partnerships without joining them as parties to the lawsuit. He also found that MRI Associates had acted within a reasonable time to add the two limited partnerships as parties after this Court's decision that MRI Associates could not recover damages on behalf of nonparties. The factual determinations regarding the application of the relation-back doctrine under Rule 17(a) are within the court's discretion. *Id.* Saint Alphonsus has not shown that Judge Wetherell abused his discretion in determining that the addition of the two limited partnerships as parties related back to the filing of the second amended counterclaim.

## B.
## Breach of Contract Claims.

The district court instructed the jury regarding two breach of contract claims: breach of the covenant not to compete in the partnership agreement and breach of the implied covenant of good faith and fair dealing. The jury determined that Saint Alphonsus had breached both covenants.

**1. Breach of the covenant not to compete.** Saint Alphonsus became a general partner in MRI Associates on April 26, 1985. The partnership agreement, as later amended, prohibited Saint Alphonsus from competing with MRI Associates within 100 miles of the MRI Center while Saint Alphonsus[2] was a partner and for one year after it ceased being a partner. Thus, Saint Alphonsus was bound by the noncompetition provision in the partnership agreement until April 1, 2005, one year after the effective date of Saint Alphonsus's dissociation. The district court held that the limited partnerships were third-party beneficiaries of the non-compete clause and that they could therefore also recover damages for its breach. Saint Alphonsus has not appealed that ruling.

There was evidence from which the jury could conclude that Saint Alphonsus decided that its long-term plan was to partner with IMI rather than MRI Associates and that prior to the year 2000, it began working to implement that plan. The jury found that Saint Alphonsus had

---

[2] Although Saint Alphonsus Regional Medical Center was not a partner in MRI Associates, it was specifically included in the provisions of the partnership agreement restricting competition and it signed the partnership agreement.

breached the covenant not to compete and that as a result MRI Center lost net profits totaling $27,922,388 and MRI Mobile lost net profits totaling $24,162,127. MRI Associates was entitled to 7.5% of the profits lost by each entity, and so the jury awarded MRI Associates $3,906,338 in damages, MRI Center $25,828,208 in damages, and MRI Mobile $22,349,967 in damages, for a total of $52,084,513.

The award to MRI Center was primarily based upon the business relationship that Saint Alphonsus entered into with IMI, which was a competitor of MRI Center and located slightly over three miles away. On July 1, 2001, Saint Alphonsus became a member of IMI. The operating agreement effective on that date stated that Saint Alphonsus was acquiring a 50% interest in the non-MRI operation of the company and that the agreement did not apply to the ownership, operation, and management of the MRI operation of the company. However, IMI was one business entity. Saint Alphonsus made a capital contribution of $546,347 to IMI, and it invested $780,000 in the company's information technology. There was also evidence of other assistance that Saint Alphonsus provided to IMI while Saint Alphonsus was contractually prohibited from competing with MRI Associates.

The award to MRI Mobile was based upon IMI opening a facility in Meridian, Idaho, in 2002, which competed with MRI Mobile. The Meridian facility was located less than seven miles from MRI Center. There was evidence that in 2000, MRI Associates had wanted to open a facility in Meridian, but Saint Alphonsus, as a partner in MRI Associates, opposed doing so. However, the operating agreement that Saint Alphonsus signed to become a member of IMI in 2001 stated that Saint Alphonsus as a member agreed in good faith to pursue the development of a medical imaging center in Meridian, which it did. Thus, there was evidence that while Saint Alphonsus was dissuading MRI Associates from opening a facility in Meridian, Saint Alphonsus was actively supporting IMI in doing so.

On appeal, Saint Alphonsus does not challenge the jury's findings as to liability for breaching the covenant not to compete. It only challenges the sufficiency of the evidence to prove the damages found by the jury.

The evidence of lost profits was based upon the testimony of Bruce Budge and Charles Wilhoite. Mr. Budge had been a professional accountant for 39 years. In 1990, he became a partner in Arthur Anderson, where for nine years he ran a division that specialized in accounting measurements including damages measurements and forensic accounting. After Arthur

Anderson went out of business, he worked for KPMG, LLP. He then went with FTI Consulting, where he had been a full-time forensic accountant for eight years prior to testifying at the trial.

Mr. Budge testified as to his opinion of lost profits from 2001 through 2010, assuming that causation was proved. Mr. Wilhoite used Mr. Budge's opinions as to lost profits to project future lost profits to 2015. Since Mr. Wilhoite's opinion as to future lost profits was based upon Mr. Budge's opinion as to lost profits incurred through 2010, Saint Alphonsus focuses its objection upon Mr. Budge's testimony.

Mr. Budge's testimony as to the profits lost by MRI Center was based upon his estimate of the number of MRI scans that MRI Center lost to IMI as a result of IMI's competition with MRI Center during the period that Saint Alphonsus was prohibited from competing with MRI Center under the terms of the partnership agreement. Mr. Budge identified all of the physicians who had referred patients to MRI Center prior to IMI opening for business and the new physicians in the area who were solely affiliated with Saint Alphonsus. He assumed that physicians who previously referred patients to MRI Center would have continued to do so and that new physicians affiliated only with Saint Alphonsus would refer patients to the facility on the Saint Alphonsus campus, which was MRI Center. Referrals from those two groups of physicians constituted 42% of the MRI scans performed at IMI's downtown location. Mr. Budge testified that he did not include in his estimate of lost MRI scans those that were ordered by physicians who could admit patients to both Saint Alphonsus and the other major hospital in Boise. He also did not include scans that were referred to other facilities by physicians who had previously referred patients to MRI Center.

Mr. Budge's testimony as to the profits lost by MRI Mobile was based upon the profits of the IMI facility in Meridian. He viewed the claim regarding the IMI Meridian facility as an opportunity available to MRI Associates that Saint Alphonsus usurped. He assumed that had MRI Associates been supported in its desire to open a facility in Meridian, it would have been in the same competitive market as IMI was when it opened its facility. He also assumed that the costs for MRI Associates to open a facility in Meridian would have been the same as the costs incurred by IMI to do so. He also calculated, on an annual basis, the profit margins from IMI Meridian and the profit margins for MRI Center. His calculations showed that MRI Center had higher profit margins than IMI Meridian. In his lost profits calculations, he used the sums actually received by IMI and its profit margin to calculate the profits that MRI Associates would

8

have received had Saint Alphonsus working with IMI not usurped the opportunity to establish the facility.

Saint Alphonsus contends that the methodology used by Mr. Budge was insufficient to prove lost profits. With respect to MRI Center, Saint Alphonsus argues that Mr. Budge's methodology was insufficient under *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 646 P.2d 988 (1982), because it failed to show that Saint Alphonsus's conduct, as opposed to other factors, caused all or any particular portion of the claimed business migration from MRI Center to IMI and because the calculation of the scans that MRI Associates lost to IMI was nothing more than a rough guess. In *Pope*, we stated:

> To meet the minimum requirement of proof in market exclusion cases in which lost profits are sought, the plaintiff must normally produce evidence falling into one of the following categories: (1) comparison of plaintiff's performance before and after the wrongful conduct under otherwise similar conditions; (2) comparison of performance of plaintiff's business, with comparable business in an unrestrained market otherwise comparable to plaintiff's market; or (3) loss of specific business or customers.

*Id*. at 236, 646 P.2d at 1007 (citations omitted).

Mr. Budge produced a chart showing the number of MRI scans done by MRI Center each year from 1998 through 2006 and the number of such scans done by IMI each year during the same timeframe. That chart certainly could be read as indicating that there was a negative impact on the number of MRI scans done by MRI Center in 2001 when Saint Alphonsus partnered with IMI; that there was a more significant negative impact beginning in 2002 when Saint Alphonsus and IMI opened their Meridian facility; and that during that time frame there was a steady increase in scans done by IMI. Mr. Budge testified, "I do think that the overall conclusion that there was a massive migration of referrals from MRIA to IMI is borne out by the data in the aggregate that we also looked at." He also sought to identify the loss of specific customers—the physicians who referred patients.

With respect to MRI Mobile, Saint Alphonsus argues that the use of IMI's financial data from its Meridian facility to calculate MRI Mobile's damages is a methodology held insufficient in *Trilogy Network Systems, Inc. v. Johnson*, 144 Idaho 844, 172 P.3d 1119 (2007). In *Trilogy*, this Court stated, "The measure of damages for the breach of an anti-competition clause is the amount that the plaintiff lost by reason of the breach, not the amount of profits made by the defendant." *Id*. at 846, 172 P.3d at 1121. However, the defendant in *Trilogy* was a former

9

employee of the plaintiff, who had agreed not to do business with the plaintiff's customers for a period of one year. *Id*. The defendant violated that agreement by outbidding the plaintiff to obtain a contract with one of the plaintiff's customers. *Id*. In that case, the competition that violated the agreement not to compete was between two existing businesses. In this case, the wrongful conduct was in the nature of usurping a partnership opportunity to open a facility in Meridian, which then competed against MRI Mobile. In this circumstance, the measure of lost profits would be the net profits of the facility. It would not make sense to hypothesize another facility which could have been opened by MRI Mobile against which IMI Meridian could hypothetically compete. Under the facts of this case, the net profits generated by IMI Meridian would be the measure of damages for Saint Alphonsus's breach of the covenant not to compete.

Prior to the trial, Saint Alphonus had two written reports from Mr. Budge regarding his damages calculations, and it had deposed him. The admissibility of an expert's opinion "depends on the validity of the expert's reasoning and methodology." *Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009). Saint Alphonsus did not object to Mr. Budge's reasoning and methodology, and therefore any objection to his reasoning and methodology was waived. *Saint Alphonsus Diversified Care*, 148 Idaho at 494, 224 P.3d at 1083; *Kirk v. Ford Motor Co.*, 141 Idaho 697, 701-02, 116 P.3d 27, 31-32 (2005). "Once an expert's opinion is admitted, it is up to the trier of fact to weigh the opinion against any conflicting testimony. The jury's weighing of conflicting, admitted opinions will not be second-guessed on appeal." *Coombs*, 148 Idaho at 137, 219 P.3d at 461 (citation omitted).

"[E]vidence is sufficient if it proves the damages with reasonable certainty. 'Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation.'" *Griffith v. Clear Lakes Trout Co., Inc.*, 146 Idaho 613, 618, 200 P.3d 1162, 1167 (2009) (citation omitted). "The measure of damages for loss of profits is 'rarely susceptible of accurate proof . . . .' Therefore, the law does not require 'accurate proof with any degree of mathematical certainty . . . .'" *Trilogy*, 144 Idaho at 846, 172 P.3d at 1121 (citations omitted). "Any claim of damages for prospective loss contains an element of uncertainty, but that fact is not fatal to recovery. 'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Smith v. Mitton*, 140 Idaho 893, 900, 104 P.3d 367, 374 (2004) (citations omitted). The party seeking to recover lost profits

is not required to obtain the testimony of the customers allegedly lost as a result of the wrongdoer's conduct. *General Auto Parts Co., Inc. v. Genuine Parts Co.*, 132 Idaho 849, 859, 979 P.2d 1207, 1217 (1999). There only need be sufficient evidence in the record to allow the jury to conclude that the inference linking the wrongdoer's conduct to the claimant's damages is more probable than the inference connecting such loss to other factors. *Id.* Factors that the jury may consider include the claimant's profits for a reasonable period prior to the breach of the covenant not to compete, "leaving it for the other party to show that, by depression in trade or other causes, they would have been less," *Ryska v. Anderson*, 70 Idaho 207, 215, 214 P.2d 874, 878 (1950), the relationship between the increase in profits by the party breaching the covenant and the losses sustained by the claimant during the period of the breach, *id.* at 213, 214 P.2d at 877, and all of the surrounding facts and circumstances, *Vancil v. Anderson*, 71 Idaho 95, 104, 227 P.2d 74, 79 (1951).

"This Court must affirm the jury verdict if it is supported by substantial and competent evidence." *Lakeland True Value Hardware, LLC v. Hartford Fire Ins. Co.*, 153 Idaho 716, 726, 291 P.3d 399, 409 (2012). "All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper." *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974). The jury was presented with conflicting testimony regarding the cause of the damages allegedly suffered by the MRI Entities. "On appeal, we will not substitute our opinion for that of the jury with respect to the credibility of witnesses or the weight to be given to, and inferences to be drawn from, the evidence." *Phillips v. Erhart*, 151 Idaho 100, 106-07, 254 P.3d 1, 7-8 (2011). We affirm the judgment awarding damages for breach of the covenant not to compete.

**2. Lost profits incurred after Saint Alphonsus dissociated.** The district court instructed the jury that, pursuant to the partnership agreement, Saint Alphonsus could not compete with the MRI Entities until April 1, 2005, and that the jury may not award damages to the MRI Entities "simply because Saint Alphonsus competed with these businesses after April 1, 2005, which it had the right to do." However, the court also instructed the jury that if it found that Saint Alphonsus began to compete with the MRI Entities prior to April 1, 2005, or otherwise caused economic damages to them prior to April 1, 2004, "you may then award damages to MRIA, MRI Center, and MRI Mobile for any injury caused by Saint Alphonsus's conduct prior to 2005, even if the damages caused by those actions occurred after 2005." When instructing the

11

jury regarding the claim that Saint Alphonsus breached the noncompetition clause in the partnership agreement, the court stated that the MRI Entities had the burden of proving that "Saint Alphonsus breached the contract by competing with the MRI entities prior to April 1, 2005" and that "[t]he MRI entities had been damaged as a proximate cause of the breach of contract." Finally, when instructing the jury regarding the measure of damages for the breach of the covenant not to compete, the court stated that the jury must determine "the amount of money that will reasonably and fairly compensate MRIA, MRI Center, and MRI Mobile for the net profits lost that the evidence proves to have been a natural and proximate result of Saint Alphonsus's breach of contract." Saint Alphonsus did not object to any of these instructions.[3] As mentioned above, the jury found that Saint Alphonsus had breached the covenant not to compete and awarded the MRI Entities damages totaling $52,084,513.

On January 31, 2012, Saint Alphonsus filed a motion for a judgment nothwithstanding the verdict contending, among other things, that the MRI Entities failed to prove that any of the lost profits sustained after April 1, 2005, when the noncompetition clause expired, were caused by a breach of the noncompetition clause that occurred prior to that date. After briefing and argument, the district court denied the motion. With respect to this ground for the motion, the district court noted that "MRIA's entire theory of the case was that Saint Alphonsus's wrongful acts effectively destroyed MRIA as a business." The court held that if the jury found that Saint Alphonsus had breached the noncompetition clause prior to April 1, 2005, "they could clearly find the bad acts caused MRIA to cease being a viable market competitor, and they could then reasonably infer that the [sic] an appropriately proven share of the scans going to IMI (both downtown and on-campus) would have gone to MRIA if it were still a viable competitor." Saint Alphonsus appeals the district court's ruling on that aspect of its motion.

Our standard for reviewing a trial court's decision on a motion for a judgment notwithstanding the verdict is the same standard that applied to the trial court when it decided the motion. *Mosell Equities, LLC v. Berryhill & Co., Inc.*, 154 Idaho 269, 275, 297 P.3d 232, 238 (2013). "A jury verdict must be upheld if there is evidence of sufficient quantity and probative

---

[3] "Where there is no objection to the jury instructions, the sufficiency of the evidence to support a verdict must be based upon the jury instructions. That is because the jury is to apply the law as set forth in the jury instructions to the facts in order to reach the verdict. Whether the evidence was sufficient to support the verdict will therefore depend upon the law as set forth in the jury instructions." *Mosell Equities, LLC v. Berryhill & Co., Inc.*, 154 Idaho 269, 275, 297 P.3d 232, 238 (2013) (citation omitted).

12

value that reasonable minds could have reached a similar conclusion to that of the jury. . . . [T]he court may not reweigh evidence, consider witness credibility, or compare its factual findings with that of the jury." *Athay v. Rich Cnty.*, 153 Idaho 815, 825, 291 P.3d 1014, 1024 (2012). "The party making the motion for a judgment notwithstanding the verdict necessarily admits the truth of all of the opposing party's evidence and every legitimate inference that could be drawn from that evidence in the light most favorable to the opposing party." *Mosell Equities*, 154 Idaho at 275, 297 P.3d at 238.

Saint Alphonsus argues that the testimony of Mr. Budge was insufficient to show the alleged damages if Saint Alphonsus could lawfully compete with the MRI Entities after April 1, 2005. Saint Alphonsus points to Mr. Budge's testimony in which he admits that for the purposes of his damages calculations, he did not assume that Saint Alphonsus could lawfully compete after that date. During Mr. Budge's direct examination, the following occurred:

> MR. BANDUCCI: Q. Now are you aware of Saint Alphonsus's allegation that they were able to lawfully compete after 2005?
> MR. BUDGE: A. Yes.
> Q. All right. And in your analysis, did you assume that this dissociation cut off damages?
> A. I did not.

However, the rightful dissociation would not cut off damages for breach of the covenant not to compete, because it extended for one year after dissociation. Under the jury instructions given, the expiration of the covenant not to compete would also not cut off damages, if those damages were shown to have been caused by Saint Alphonsus's prior breach of the covenant.

Saint Alphonsus also points to the following exchange during Mr. Budge's cross-examination.

> MR. FRIEDMAN: Q. You have assumed for purposes of this analysis and for this question that Saint Alphonsus was entitled to compete beginning in 2005; correct?
> MR. BUDGE: A. That is not correct.
> Q. All right.
> A. I assumed it for purposes of this last question. I did not assume it for purposes of my damage calculation.

However, during his direct examination, Mr. Budge had further explained that his calculation of damages would only change if there were no damages occurring after Saint Alphonsus was entitled to compete that were caused by its prior conduct. The exchange was as follows:

MR. BANDUCCI: Q. Okay. Now, let me ask the question this way so that the jury can kind of get a sense for this hypothetical. Let's assume that in 2005 Saint Alphonsus could legally compete and that there was no splash-over, let's call it, no lasting effect of the prior bad acts so that we cut off all of the purported damages as of 2005 where lawful competition could occur.

MR. BUDGE: A. Yes.

Q. Explain how that would look, what the jury would be looking at on this chart, to determine the impact of that hypothetical.

A. In that situation where none of these damages relate to pre-withdrawal acts, if this was all lawful competition for 2006 forward let's say, that would take about $10.7 million out of my damages calculation.

It would not change Magicview [IMI Meridian], because that's a usurped opportunity. The issue there is who basically owns that business and is going to control that business. Same would be true for Eagle.

For downtown, if I assume that all of these periods from 2006 forward are not unlawful diversions, they're just the result of competition, then that's going to take another about $4 million, a little less than $4 million out of the damages.

For those years between this group here and this group here, there is a little more than $14 million, I think about $14.4 million of damages that would be removed from my model. So this $46 million goes to a little less than $32. I think it's fairly close to $31.9 million, *if you assume that all of these injuries were the result of lawful competition and not bad acts*.

(Emphasis added.)

Saint Alphonsus also argues that "Budge also acknowledged that calculating post-2005 harms claimed to result from pre-2005 conduct would require an entirely different analysis than the one he performed." In support of that argument, Saint Alphonsus first cites to Mr. Budge's deposition testimony. The issue is whether the evidence admitted during the trial supports the jury's determination of damages, not whether other evidence that was not admitted during the trial would have impacted the jury's determination. Therefore, deposition testimony that was not admitted during the trial is irrelevant to the determination of whether the district court erred in denying the motion for a judgment notwithstanding the verdict.

During his trial testimony, Mr. Budge was asked about markings that he had made during his deposition on a diagram he had prepared with a line illustrating MRI Center's actual scan volume from 1985 through 2010 and a "but-for" line illustrating his opinion of what the scan volume would have been during that period if none of the alleged wrongful acts had occurred. He testified that during his deposition, he was asked how the but-for line would look if Saint Alphonsus could rightfully compete after the expiration of the non-compete period. He then marked the diagram indicating that once Saint Alphonsus could rightfully compete, the but-for

14

line would continue declining sharply and would coincide with the line showing actual scan volume in about five years. That would indicate that if Saint Alphonsus could rightfully compete after April 1, 2005, the MRI Entities suffered substantially less damages than claimed after that date and that the MRI Entities would not suffer any damages after about 2010. Saint Alphonsus argues that during his testimony about this modification of the diagram, Mr. Budge "specifically confirmed that he was not offering any expert opinion on what the actual damages were, assuming the Hospital's rightful dissociation and subsequent lawful competition."

After testifying about the modification he had made to the diagram during his deposition, Mr. Budge was asked whether the modification properly illustrated his opinion assuming that Saint Alphonsus could rightfully compete after April 1, 2005. He answered that it did not. He was then asked why, and he responded that he drew the line based upon the assumption that there were no bad acts prior to the time Saint Alphonsus was entitled to begin competing. He testified:

> When I drew this, in the world that I'm trying to imagine, *there was no bad acts*. Remember we're talking about the but-for line. *So all those allegations, whether they be disparagement or technology support, none of them happened in this world*. Now we go along till 2005, there's been no competitor established at this point in time by Saint Al's, which is one of the allegations. In 2005 for some reason they decide that they are going to compete.

(Emphases added.)

He then testified that when he drew the line on the diagram, he assumed that the slope of the line showing the decreasing actual scans after 2005 would be the same as it would be if Saint Alphonsus had first started competing at that time. He explained that that assumption was wrong for two reasons. The first reason he gave was, "A lot of the loss of scans has to do with alleged behavior that happened back here when there was no ability to compete if you find that these pre-withdrawal allegations are right." The second reason was: "[T]his decline is the result of what I understand to be active influence of or at least alleged to be active influence to divert scans by the hospital from MRIA to IMI. In the new but-for world, my new understanding is that that couldn't happen."

Saint Alphonsus contends that "Budge did concede, however, that, assuming rightful competition after 2005, *all* damages for IMI on campus scans ('$10.7 million'), and *all* damages for IMI downtown scans from 2006 onward ('about $4 million') would have to be excised from his report." That statement is incorrect. What Mr. Budge stated was that if there were no bad

acts before April 1, 2005, that caused damages thereafter, then his damages calculations would have to be reduced by those amounts. He testified:

> MR. BANDUCCI: Q. Okay. Now, let me ask the question this way so that the jury can kind of get a sense for this hypothetical. Let's assume that in 2005 Saint Alphonsus could legally compete and that there was no splash-over, let's call it, no lasting effect of the prior bad acts so that we cut off all of the purported damages as of 2005 where lawful competition could occur.
>
> MR. BUDGE: A. Yes.
>
> Q. Explain how that would look, what the jury would be looking at on this chart, to determine the impact of that hypothetical.
>
> A. In that situation where none of these damages relate to pre-withdrawal acts, if this was all lawful competition for 2006 forward let's say, that would take about $10.7 million out of my damages calculation.
>
> . . . .
>
> For downtown, if I assume that all of these periods from 2006 forward are not unlawful diversions, they're just the result of competition, then that's going to take another about $4 million, a little less than $4 million out of the damages.

On cross-examination, Mr. Budge was asked about this testimony, and he again clarified that it was based upon the assumption that there were no damages occurring after April 1, 2005, that were caused by conduct that occurred prior to that date.

> MR. FRIEDMAN: Q. You were kind enough to discuss with Mr. Banducci by what amount your damages calculations would be reduced if you assumed that Saint Alphonsus was entitled to compete 2005 and thereafter. Do you recall that?
>
> MR. BUDGE: A. Assumed not only that but that there was no carryover from the other allegations. Yes, I do.

Later in his cross-examination, Mr. Budge testified that the but-for scan volume shown on his unmodified diagram would be his estimation of the scan volume if there had been no wrongdoing.

> BY MR. FRIEDMAN: Q. So now the but-for scan volume, correct me if I'm wrong on this, is what the scan volume would have been in your estimation had everything happened the same way but in the absence of any wrongdoing; is that right?
>
> MR. BUDGE: A. Yes.

Finally, Saint Alphonsus argues that Mr. Budge's diagram could be interpreted to show that MRI Center lost scans for reasons other than Saint Alphonsus's wrongful conduct. As stated above, when reviewing the denial of a motion for a judgment notwithstanding the verdict, this

16

Court "may not reweigh evidence, consider witness credibility, or compare its factual findings with that of the jury." *Athay*, 153 Idaho at 825, 291 P.3d at 1024.

Saint Alphonsus has failed to show that the district court erred in failing to grant the motion for a judgment notwithstanding the verdict.

**3. Breach of the implied covenant of good faith and fair dealing.** The jury was instructed regarding the alleged breach of the implied covenant of good faith and fair dealing, and it found that Saint Alphonsus had breached that covenant. The jury instruction did not identify the contractual provision that Saint Alphonsus allegedly violated or nullified or the contractual benefit that it allegedly significantly impaired.

"Any action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant." *Metcalf v. Intermountain Gas Co*., 116 Idaho 622, 627, 778 P.2d 744, 749 (1989). "A violation of the implied covenant is a breach of contract. It does not result in a cause of action separate from the breach of contract claims, nor does it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant." *Idaho First Nat. Bank v. Bliss Valley Foods, Inc*., 121 Idaho 266, 289, 824 P.2d 841, 864 (1991).

There is no indication of any claimed damages specifically relating to the breach of the covenant of good faith. The jury instruction on damages lumped together "the breach of the non-compete clause claim, the breach of the covenant of good faith and fair dealing claim, the civil conspiracy claim, the intentional interference with prospective contractual relations claim, the breach of fiduciary duty claim, or the misappropriation of a partnership opportunity claim." As to each of those claims, the court instructed the jury that it must "determine the amount of money that will reasonably and fairly compensate MRIA, MRI Center, and MRI Mobile for the net profits lost that the evidence proves to have been a natural and proximate result of Saint Alphonsus's breach of contract." The jury awarded identical damages for breach of the covenant of good faith and fair dealing as it awarded for breach of the covenant not to compete. It appears that the jury simply determined that Saint Alphonsus did not act in good faith when it breached the covenant not to compete, which finding is irrelevant.

In any event, Saint Alphonsus does not challenge the finding that it breached the implied covenant of good faith and fair dealing. The damages awarded for the breach of that covenant were identical to those awarded for breach of the covenant not to compete, and those awards

17

were in the alternative. The only challenge is to the damages awarded. Since we affirmed the award for breach of the covenant not to compete, we therefore also affirm this alternative award of identical damages.

## C.
### Breach of Fiduciary Duties.

As the general partner in the limited partnerships, MRI Associates owed fiduciary duties to the limited partners, MRI Center and MRI Mobile, which included the duty to refrain from competing with the limited partnerships and the duty to account to the limited partnership and hold as trustee any profit derived from the appropriation of a limited partnership opportunity. I.C. § 53-2-408(2)(a), (c). Each of the general partners in MRI Associates also owed the same fiduciary duty to the limited partnerships. To hold otherwise would eviscerate the fiduciary duty of the general partnership. The general partners in a partnership—that is the general partner of a limited partnership—would be permitted individually to compete with the limited partnership and to appropriate its partnership opportunities.

In the special verdict form, the jury was asked whether Saint Alphonsus breached "a fiduciary duty owed to MRIA, MRI Center or MRI Mobile." The jury answered that question in the affirmative. It then awarded damages that were identical to the damages awarded for breach of the covenant not to compete. Saint Alphonsus raises several alleged errors made by the district court regarding the claim for breach of fiduciary duties.

The district court instructed the jury, over Saint Alphonsus's objection, that even if Saint Alphonsus rightfully dissociated from MRI Associates, such dissociation could constitute a breach of a fiduciary duty if Saint Alphonsus's decision to dissociate was improperly motivated to obtain financial gain. The court relied upon our decision in *Bushi v. Sage Health Care, PLLC*, 146 Idaho 764, 203 P.3d 694 (2009). That case does not so hold.

Bushi and three other licensed psychiatrists formed a limited liability company. *Id.* at 765, 203 P.3d at 695. The others later told Bushi that they wanted him out as a member because he was dating a nurse practitioner employed by the company. *Id.* at 766, 203 P.3d at 696. In November 2005, he joined a competing group of psychiatrists, and the other three then voted to deny him profit sharing for the year 2006. *Id.* In January 2006, they voted to amend the operating agreement to require mandatory dissociation upon the vote of the remaining members,

and they then voted to dissociate Bushi effective immediately. *Id*. at 767, 203 P.3d at 697. Applying the formula in the operating agreement, the company's accountant determined that Bushi was entitled to $11,245 for his membership share, even though in July 2003 the members had all valued each member's share at $250,000 when they applied for a line of credit at a bank. *Id*. at 771, 203 P.3d at 701. This Court held that Bushi could have a cause of action against the other members for breach of their fiduciary duties if their motivation for terminating his membership was to increase the value of their individual shares. *Id*.

*Bushi* is inapposite to this case. Here, Saint Alphonsus voluntarily dissociated from the partnership, which it had a statutory right to do under Idaho Code section 53-3-602(a), and it dissociated rightfully under Idaho Code section 53-3-602(b). "The fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c) of this section [Idaho Code section 53-3-404]." I.C. § 53-3-404(a). The duty of loyalty includes refraining from competing with the partnership. I.C. § 53-3-404(b)(3). That duty terminates upon dissociation. I.C. § 53-3-603(b). It would be anomalous to hold that a partner has no fiduciary duty to refrain from competing with the partnership upon dissociation, but if the partner dissociates for the purpose of doing so, the partner is liable to the partnership for breaching a fiduciary duty. If the partner wrongfully dissociates, then the partner can be liable to the partnership and to the other partners for damages caused by the dissociation. I.C. § 53-3-602(c). That did not occur in this case. The district court erred in instructing the jury that Saint Alphonsus could be liable for breaching a fiduciary duty if its decision to dissociate from MRI Associates was motivated to obtain financial gain.

Saint Alphonsus also challenges several of the district court's rulings based upon its belief that Saint Alphonsus could be liable for breach of its fiduciary duties if it dissociated for monetary gain. The court permitted testimony regarding Saint Alphonsus's termination of a pathologist in a wholly unrelated matter in order to show that the termination was for monetary gain, which the court believed was relevant to show Saint Alphonsus's motive for dissociation in this case. The court permitted admission of a memorandum from consultants hired by Saint Alphonsus in which the consultants stated that if Saint Alphonsus withdrew from MRI Associates, "there may be a risk of St. Alphonsus breaching its fiduciary responsibility to the LPs [limited partnerships]." The court prohibited Saint Alphonsus from telling the jury it had rightfully dissociated from MRI Associates, and it rejected Saint Alphonsus's requested

instruction informing the jury that "Saint Alphonsus had a legal right to withdraw, or 'dissociate,' from the MRIA partnership when it did so, on April 1, 2004," but that did "not prevent the MRI entities from arguing that Saint Alphonsus breached its contractual obligations or fiduciary duties before it withdrew from the MRIA partnership." Instead the court instructed the jury that "[t]he mere act of dissociation from a partnership is not a violation of Idaho law."

Saint Alphonsus challenges the district court's ruling permitting evidence to show that Saint Alphonsus breached a fiduciary duty by failing to require the Radiologists to provide after-hours services at the MRI Center for nonemergency patients. The Radiologists had entered into a contract with Saint Alphonsus to provide radiological services as independent contractors to hospital patients. On August 7, 2002, the Radiologists sent MRI Center a letter stating that "it cannot be assumed that we are 'immediately available' for care in the case of a contrast reaction or to provide physician monitoring for the complicated patients being electively screened after hours" and asking that "all contrast cases after hours be restricted to emergent basis only." The MRI Entities contended that Saint Alphonsus had a duty to require the Radiologists to provide after-hours services for patients being electively screened. The district court held that it did, and it also ruled that Saint Alphonsus's contract with the Radiologists was admissible because the jury could construe it as providing that Saint Alphonsus had the contractual right to require the Radiologists to provide services after hours to nonemergency patients.

Finally, Saint Alphonsus contends that the district court wrongly excluded evidence that would refute claims that Saint Alphonsus was attempting to keep its involvement with IMI a secret and was prohibited from mentioning its non-profit status.

Although the district court wrongly concluded that the jury could find that Saint Alphonsus breached a fiduciary duty if it dissociated for the purpose of monetary gain, we need not address the other challenged rulings made by the court based upon that incorrect conclusion, nor need we address the challenged error regarding the actions of the Radiologists. A party alleging error on appeal must also show that the alleged errors were prejudicial. "[A]lleged errors not affecting substantial rights will be disregarded." *Weinstein v. Prudential Prop. and Cas. Ins. Co.*, 149 Idaho 299, 310, 233 P.3d 1221, 1232 (2010). Saint Alphonsus has not presented any argument showing how it was prejudiced by any errors regarding the breach of a fiduciary duty, nor is any such prejudice apparent. The jury award of damages for breach of Saint Alphonsus's fiduciary duties was identical to the jury's award for breach of the covenant

20

not to compete. The violation of that covenant would as a matter of law also be a breach of a fiduciary duty, regardless of Saint Alphonsus's motivation for doing so. Saint Alphonsus admits that its conduct alleged by the MRI Entities to constitute a breach of contract would also be a breach of Saint Alphonsus's fiduciary duties. In its opening brief on appeal, Saint Alphonsus states: "Further, MRIA alleges a single injury arising from the business it allegedly lost to IMI as a result of the supposedly improper concerted acts of Saint Alphonsus and the settling defendants. Those claimed acts all violated both fiduciary and other tort duties, and good faith, non-compete, and other contractual duties." Under the facts of this case, the district court's errors regarding any additional breaches of a fiduciary duty have not been shown to affect any substantial right of Saint Alphonsus.

## D.
### Apportionment of Fault.

**1. Apportionment of fault on the contract claims.** The MRI Entities asserted claims against Saint Alphonsus for both breach of contract and torts. Prior to trial, Saint Alphonsus proposed a special verdict form that would ask the jury to apportion the damages awarded on all claims based upon the percentage of harm attributable to Saint Alphonsus and the percentage attributable to the Radiologists. During the jury instruction conference, Saint Alphonsus objected to not having the jury apportion any damages awarded for breach of contract based upon fault. Saint Alphonsus contends that because the MRI Entities alleged a single injury arising from both breach of contract and tort, Saint Alphonsus should be considered a joint tortfeasor within the meaning of Idaho Code section 6-803(4) for apportionment of fault.

Idaho Code section 6-803(4) defines "joint tortfeasor" as "one (1) of two (2) or more persons jointly or severally *liable in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them." (Emphasis added.) As drafted, the statute only applies to tort liability. The legislature could have included liability based upon breach of contract, but it did not do so. "The legislature did not choose to do so, however, and we do not have the authority to rewrite the statute to include such a provision." *Magic Valley Newspapers, Inc. v. Magic Valley Reg'l Med. Ctr.*, 138 Idaho 143, 146, 59 P.3d 314, 317 (2002).

**2. Apportioning fault as to separate causes of action.** The special verdict had the jury apportion fault separately for the claims of intentional interference with a prospective economic

advantage, breach of fiduciary duty, and civil conspiracy.[4] The jury apportioned fault to Saint Alphonsus as follows: 90% for intentional interference with a prospective economic advantage, 100% for breach of fiduciary duty, and 80% for civil conspiracy. In its order regarding Saint Alphonsus's motion for a judgment notwithstanding the verdict, the district court reduced the apportionment for intentional interference to 80% to correspond to the apportionment for civil conspiracy based upon the court's determination that the jury must have found that the conspiracy related to that claim. The court refused to reduce the apportionment of 100% to Saint Alphonsus for the breach of fiduciary duty because it interpreted the jury's apportionment on that claim as rejecting the idea that Saint Alphonsus acted in concert with any other entity in breaching its fiduciary duty.

Saint Alphonsus asserts on appeal that "the trial court erred in allowing fault to be apportioned separately as to each of MRIA's causes of action." Saint Alphonsus did not object to that portion of the special verdict form that asked the jury to separately apportion fault as to the claims of intentional interference, breach of fiduciary duty, and civil conspiracy. Absent an objection, it may not raise that issue on appeal. *O'Shea v. High Mark Dev., LLC*, 153 Idaho 119, 132, 280 P.3d 146, 159 (2012); I.R.C.P. 51(b).

**3. Allowing the jury to allocate fault.** Saint Alphonsus argues on appeal that "the district court incorrectly submitted the question of relative fault to the jury, when it should have determined Saint Alphonsus's 'pro rata' share as a matter of simple arithmetic." On April 11, 2011, Saint Alphonsus had filed a motion for summary judgment seeking an order that it may not be held liable for more than its pro rata share of 50% of any damages MRIA might prove at trial. The district court denied the motion, holding that if Saint Alphonsus and the Radiologists were

---

[4] For the purposes of this discussion, we will pretend that civil conspiracy can be a cause of action or theory of liability. In actuality, civil conspiracy is neither a cause of action nor a theory of liability. "It is quite well settled that a conspiracy to commit an actionable wrong is not in itself a cause of action. Wrongful acts committed by conspirators resulting in injury alone give rise to a cause of action." *Dahlquist v. Mattson*, 40 Idaho 378, 387, 233 P. 883, 886 (1925). "The essence of a cause of action for civil conspiracy is the civil wrong committed as the objective of the conspiracy, not the conspiracy itself." *McPheters v. Maile*, 138 Idaho 391, 395, 64 P.3d 317, 321 (2003). Thus, if two or more persons or entities conspired to commit a tort, damages cannot be awarded for the conspiracy. They can only be awarded for the tort that they conspired to commit. The existence of the conspiracy is only relevant insofar as it bears on the rules of evidence and the persons liable, including holding one conspirator liable for the conduct of the other. However, this error does not affect the outcome of this appeal because the damages awarded for civil conspiracy were less than the damages we are affirming. We are addressing this error only to again emphasize that civil conspiracy is not a claim upon which relief can be granted.

joint tortfeasors, Saint Alphonsus was entitled to a reduction of any damages awarded against it in an amount based upon the apportionment of fault at trial.

During the conference on the jury instructions, Saint Alphonsus's counsel agreed that it was not entitled to a 50-50 apportionment, but that the jury would have to apportion relative fault. The following dialogue occurred between the district court and Saint Alphonsus's counsel (Mr. Ayer and Mr. Davis) in discussing whether the court or the jury should decide whether Saint Alphonsus and the Radiologists are joint tortfeasors for the purpose of the jury apportioning damages:[5]

> THE COURT: For purposes of this motion, the Court assumes that you are a tortfeasor. I don't make the finding you're a tortfeasor.
>
> MR. AYER: Your Honor, I respectfully disagree. I think there was a dispute at the time, not only about the 50/50, but about whether there should be apportionment at all. And MRIA—
>
> THE COURT: "While a pro rata share is not a defined term within the statute, the Court finds that it refers to a joint tortfeasor's share based on his fault, *apportioned by the finder of fact*."
>
> MR. AYER: Your Honor, that's quite—quite—*we have no dispute with that*.

---

[5] The issue was apportioning fault between "GSR, IMI, and ICR," which was treated as one tortfeasor, and Saint Alphonsus. GSR refers to Gem State Radiology, which was the professional practice of the Radiologists. IMI refers to Intermountain Medical Imaging, LLC. ICR refers to Imaging Center Radiologists, a partnership of the Radiologists that was a member in IMI with Saint Alphonsus. By the time of trial, they had settled with the MRI Entities and had been dismissed from the lawsuit. Counsel for Saint Alphonsus argued that according to *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986), the issue of whether a person or entity is a joint tortfeasor for placement on the verdict form was an issue of law for the court, not the jury, based solely upon the pleadings. If the court determined that a person or entity was a joint tortfeasor, then the jury only decides the apportionment of fault. The district court ultimately agreed. The basis of the argument was the statement in *Quick* that "the trial court's determination whether a settling party is a joint tortfeasor must be based on the pleadings and not the jury's apportionment of liability." *Id.* at 783, 727 P.2d at 1211. The district court and Saint Alphonsus's counsel misinterpreted the *Quick* case. The quoted statement must be interpreted in the context in which it occurred. The issue being addressed in *Quick* was not whether a settling party should be placed on the special verdict. It was whether parties who settled prior to trial were joint tortfeasors under Idaho Code section 6-805 for the purpose of applying their payments to reduce the claim against the other tortfeasors where: (a) one settling party was left off the special verdict form and was therefore never judicially determined to be a joint tortfeasor and (b) two settling parties would not have been liable to the plaintiff because the jury determined that their negligence was less than his. *Id.* This Court held that those settling parties should be considered joint tortfeasors for the purpose of deducting their settlements from the amount of the total recovery under Idaho Code section 6-805. *Id.* at 783-84, 727 P.2d at 1211-12. In that circumstance, the determination of whether the settling person is a joint tortfeasor is based solely upon the nature of the claim that was settled, which can be determined by looking at the pleadings if the settlement occurred in connection with litigation. When the issue is whether nonparties or settling parties should be placed on the special verdict form, the analysis is different. The court only decides whether there was sufficient evidence presented at trial to establish the requisite elements of a cause of action against the nonparties or settling parties. *Van Brunt v. Stoddard*, 136 Idaho 681, 687, 39 P.3d 621, 627 (2001). If it determines that there is, then the jury decides both whether their conduct constituted a tort that contributed to the injury and the percentage of fault attributed to them. *Jones v. Crawforth*, 147 Idaho 11, 18, 205 P.3d 660, 667 (2009).

23

. . . .

MR. DAVIS:  And, Your Honor, just to be clear, I think that—I don't think that there is a disagreement.  I think that maybe—oh, we are out of paper.  It seems that what—the way that I understand the way that *Quick v. Crane* is, there is a two-step process.  First, the decision is whether we are even entitled to ask for an apportionment of damages.  And that, from *Quick v. Crane*, that preliminary step is decided by the Court based on the pleadings.

They allege that we were joint tortfeasors.  They settled with one of the joint tortfeasors.  *We are entitled to ask the jury for apportionment.*

Step two, *correctly, as Your Honor held, the jury then decides what that apportionment should be.*  But the question of whether we are entitled to ask the jury to apportion is the first step that's made by the Court as a matter of law.

*We are not arguing that there should be a 50/50.*  What we are arguing—what we are saying is that the Court already determined that *we are entitled to ask the jury to apportion.*

(Emphases added.)

Now, Saint Alphonsus contends that the jury should not have been entitled to apportion fault.  Rather, it asserts that where there are two tortfeasors, fault should simply be apportioned equally between them.

Under section 6-805(1), a release by the injured person of one tortfeasor "reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if such amount or proportion is greater than the consideration paid."  On July 2, 2007, the MRI Entities entered into a settlement with IMI and the Radiologists, releasing them from liability for the sum of $825,000.  Saint Alphonsus contends that the wording in the settlement agreement provided that the MRI Entities' total claim shall be reduced by one-half.  It bases that contention upon the wording in the settlement agreement that "[a]ny damages recovered or recoverable by Releasor against any other joint tortfeasor shall be reduced in amount by the . . . pro rata share . . . for which Releasees are found liable as may be determined in a future trial."[6]  It argues that the words "pro rata share" mean one-half when there are two tortfeasors (Gem State Radiology

---

[6] The relevant provision in the settlement stated:

> Any damages recovered or recoverable by Releasor against any other joint tortfeasor shall be reduced in amount by the ratio, portion, pro rata share, or percentage of causal negligence contractual liability, any claims arising from joint activities, or in any form for fault for which Releasees are found liable as may be determined in a future trial or other disposition of these matters including agreement or settlement by other Parties.

24

("GSR"), IMI, and Imaging Center Radiologists ("ICR") were treated as one tortfeasor). According to Saint Alphonsus, "Though the term 'pro rata' in Idaho Code § 6-805(1) is undefined, leading treatises agree that 'the term "pro rata" shares has usually been thought to mean equal shares, divided according to the number of defendants.'" Thus, according to Saint Alphonsus, under Idaho law the term "pro rata" means equal apportionment and therefore the use of that term in the settlement agreement requires that the damages awarded be reduced by one-half.

Idaho Code sections 6-801 through 6-806 were enacted in 1971. Ch. 186, §§ 1–6, 1971 Idaho Sess. Laws 862, 862-65. As initially adopted, the term "pro rata share(s)" occurred only in sections 6-803 and 6-806. Ch. 186, §§ 3 & 6, 1971 Idaho Sess. Laws 862, 863-65.

When enacted in 1971, Idaho Code section 6-803(1) stated, "The right of contribution exists among joint tortfeasors, but a joint tortfeasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his *pro rata share* thereof." Ch. 186, § 3, 1971 Idaho Sess. Laws 862, 863-64 (emphasis added). Standing alone, subsection (1) did not provide any indication of the meaning of "pro rata share." However, this Court subsequently held that if the jury apportioned the percentage of fault, a joint tortfeasor's pro rata share was based upon that apportionment. In *Blome v. Truska*, 130 Idaho 669, 946 P.2d 631 (1997), three physicians (Blome, Truska, and Farris) were found negligent in a medical malpractice case, and their fault was apportioned 33% to Blome, 33% to Truska, and 34% to Farris. *Id.* at 671, 946 P.2d at 633. Truska paid his proportionate share of the damages, but Farris was unable to pay all of his. *Id.* Blome paid his proportionate share and the portion of Farris's share that he was unable to pay (they had the same liability insurer), and Blome then sued Truska for contribution. *Id.* We stated that Idaho Code section 6-803(1) "addresses the right of contribution among co-parties." *Id.* at 673, 946 P.2d at 635. We noted "the rule that a jury may not apportion damages between joint tortfeasors who are jointly and severally liable," but recognized that "there is an exception to this rule when statutory authorization exists for such apportionment." *Id*. at 673 n.2, 946 P.2 at 635 n.2. We held that Idaho Code section 6-802 authorizes apportionment; that Idaho Code section 6-803 "provides for contribution among 'joint' tortfeasors which 'means one (1) of two (2) or more persons jointly or severally liable in tort'"; and that "[t]hese statutes authorize apportionment in joint and several liability cases." *Id.* We ruled in favor of Truska, holding that "[f]ault was apportioned in [the medical malpractice

action] establishing the parties' rights of contribution." *Id*. at 674, 946 P.2d at 636. Thus, in *Blome* we held that where the jury had apportioned fault among the joint tortfeasors, one joint tortfeasor who had paid more than his pro rata share as determined by the jury's apportionment could not obtain contribution from another joint tortfeasor who had paid his pro rata share as determined by the jury's apportionment. *Id.* In *Blome*, the pro rata share of each joint tortfeasor for the purpose of contribution was determined by the jury's apportionment of fault. Obviously, a pro rata share did not mean an equal share.

When enacted in 1971, Idaho Code section 6-803(3) stated:

> (3) When there is such a disproportion of fault among joint tortfeasors as to render inequitable an *equal distribution among them of the common liability by contribution*, *the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares* solely for the purpose of determining their rights of contribution among themselves, each remaining severally liable to the injured person for the whole injury as at common law.

Ch. 186, § 3, 1971 Idaho Sess. Laws 862, 864 (emphasis added). Under section 6-803(3), the rights of contribution among joint tortfeasors can be either "an equal distribution among them of the common liability" or "the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares." Thus, subsection (3) clearly disproves any contention that pro rata share meant only an equal share.

However, in 1987, the legislature amended Idaho Code section 6-803(3) so that it provides as follows:

> The common law doctrine of joint and several liability is hereby limited to causes of action listed in subsection (5), (6) and (7) of this section. In any action in which the trier of fact attributes the percentage of negligence or comparative responsibility to persons listed on a special verdict, the court shall enter a separate judgment against each party whose negligence or comparative responsibility exceeds the negligence or comparative responsibility attributed to the person recovering. The negligence or comparative responsibility of each such party is to be compared individually to the negligence or comparative responsibility of the person recovering. Judgment against each such party shall be entered in an amount equal to each party's proportionate share of the total damages awarded.

Ch. 278, § 4, 1987 Idaho Sess. Laws 571, 578. This amendment deleted any reference to equal shares or the equal distribution among the tortfeasors of their common liability. Because subsection (3) as initially enacted was the only reference to pro rata share being based upon an

26

equal distribution among the joint tortfeasors of their common liability, after this amendment there is no statutory basis for concluding that a pro rata share is synonymous with an equal share.

When enacted in 1971, Idaho Code section 6-806 provided:

> A release by the injured person of one (1) joint tortfeasor does not relieve him from liability to make contribution to another joint tortfeasor unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the *pro rata share* of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors. This section shall apply only if the issue of proportionate fault is litigated between joint tortfeasors in the same action.

Ch. 186, § 6, 1971 Idaho Sess. Laws 862, 864-65 (emphasis added). The last sentence of this section was added "to conform to Idaho's comparative negligence scheme." *Tucker v. Palmer*, 112 Idaho 648, 651, 735 P.2d 959, 962 (1987). It states, "This section shall apply only if the issue of *proportionate fault* is litigated between joint tortfeasors in the same action." Ch. 186, § 6, 1971 Idaho Sess. Laws 862, 864-65 (emphasis added). It would not make sense to hold that the pro rata share in section 6-806 meant an equal share, because the section only applies if the issue of proportionate fault is litigated between joint tortfeasors in the same action.

Thus, since 1987 there has been no statutory basis for holding that a pro rata share is an equal share for each joint tortfeasor. The statutory reference to pro rata share is based upon the determination of proportionate fault, which is consistent with the use of pro rata share in the settlement agreement. In its decision denying Saint Alphonsus's motion that it was liable for only one-half of any damages awarded based upon the settlement agreement, the district court stated that "the Court finds that it refers to a joint tortfeasor's share based on his fault apportioned by the finder of fact." The district court did not err in holding that "Saint Alphonsus is entitled to a reduction in any damages awarded against it in an amount based on apportionment of fault to be determined at trial."

## E.
## Damages for Reduction in Value and Disgorgement.

The special verdict asked the jury to award damages for the decrease in value of MRI Center as a result of Saint Alphonsus's breach of contract, interference with prospective

economic opportunity, breach of fiduciary duty, and civil conspiracy. In each case, the jury found that the loss of value was $25,420,000. After the trial, the district court also found that the MRI Entities had proved that Saint Alphonsus misappropriated partnership opportunities in joining with IMI at its downtown location and the Meridian location, and the court awarded MRI Associates the sum of $21,353,838 as Saint Alphonsus's net profit from those operations. Saint Alphonsus presents several challenges to these awards.

The loss of value award to MRI Center of $25,420,000 was an alternative to its award of lost profits in the sum of $25,828,208, and the disgorgement award of $21,353,838 was in alternative to all other awards to the MRI Entities, the largest of which total $52,084,513. Based upon the assumption that the MRI Entities will choose the greater awards in each case, we see no need to address the alleged errors with respect to the lesser awards.

## F.
## Interest on Saint Alphonsus's Judgment.

On October 18, 2004, Saint Alphonsus filed this action against MRI Associates seeking to recover the value of its partnership interest. On March 21, 2006, MRI Associates filed a motion for partial summary judgment seeking a ruling that Saint Alphonsus had wrongfully dissociated from the partnership and that the value of its partnership interest was to be determined according to Sections 6.1 and 6.2 of the partnership agreement. On May 5, 2006, Saint Alphonsus responded with its motion seeking a ruling that its dissociation was rightful. After hearing argument on the motions, Judge McLaughlin entered a decision on July 24, 2006, holding that the dissociation was wrongful. With respect to the manner of determining the value of the partnership interest, Judge McLaughlin held that the partnership agreement was ambiguous as to whether Section 6.1 and 6.2 applied, which precluded summary judgment. He later ruled that the value of the partnership interest was a matter of equity to be determined by the court.

After the jury verdict in the first trial, Judge McLaughlin entered findings of fact, conclusions of law, and a judgment regarding the value of Saint Alphonsus's partnership interest. He found that the provision in the partnership agreement for valuing a withdrawing partner's interest was limited to the four reasons for withdrawal listed in that section of the agreement and

28

that the value of Saint Alphonsus's partnership interest was $4.6 million. On September 21, 2007, Judge McLaughlin entered a judgment stating as follows:

> The Court finds that upon withdrawal, MRIA owed SADC for their interest in the partnership as of April 2004, which was $4,600,000 pursuant to Idaho Code section 53-3-701. The Court will award Saint Alphonsus their share of the partnership in this amount and offset this award against the judgment against Saint Alphonsus on MRIA's counterclaim.

In the final judgment in this case after the first appeal, the district court ordered "that Saint Alphonsus is awarded $4,600,000 against MRI Associates, bearing interest at the judgment rate of 10% per annum, calculated from September 21, 2007, until paid in full." Saint Alphonsus argues on appeal that the district court erred by not having the interest run from April 1, 2004, the date of dissociation, as provided in Idaho Code section 53-3-701(b).

The judgment entered on September 21, 2007, did not include prejudgment interest from the date of dissociation on Saint Alphonsus's award of $4.6 million for its partnership share. The failure to include such interest in the judgment was an issue that could have been raised in the first appeal, but Saint Alphonsus did not raise it. "The 'law of the case' doctrine . . . prevents consideration on a subsequent appeal of alleged errors that might have been, but were not, raised in the earlier appeal." *Taylor v. Maile*, 146 Idaho 705, 709, 201 P.3d 1282, 1286 (2009). Therefore, since the issue of the failure to award prejudgment interest was not raised in the first appeal, we will not consider it on this appeal.

### III.
### THE MRI ENTITIES' ISSUES ON CROSS-APPEAL

### A.
### Wrongful Dissociation.

**1. Common law claim for wrongful dissociation.** Idaho Code section 53-3-602(b)(1) provides that a partner's dissociation is wrongful if "[i]t is in breach of an express provision of the partnership agreement." The partnership agreement provided that any hospital partner may withdraw for one of four reasons, but we held that such provision did not expressly limit the right to withdraw. *Saint Alphonsus Diversified Care*, 148 Idaho at 487-89, 224 P.3d at 1076-78. The MRI Entities claim that they still have a common law right to sue for breach of contract on the ground that under a common law action for breach of contract the limitation on the right to

withdraw need not be expressly stated. They argue that "[i]n Idaho, a clear and specific legislative intent is required to override the common law" and that Idaho Code section 53-3-602(b)(1) does not express a clear intent to do so.

Idaho adopted the common law of England as it existed on January 4, 1864. *In re Killgore's Estate*, 84 Idaho 226, 230-32, 370 P.2d 512, 514-15 (1962). The MRI Entities have not pointed to any rules or principles of the common law of England as it existed on January 4, 1864, that would in any way limit the right of a partner to withdraw from a partnership. Their argument that Idaho Code section 53-3-602(b)(1) altered a common law right to sue for breach of contract is erroneous. The statute did no such thing. It merely set forth a requirement of clarity in the agreement in order to recover for wrongful dissociation. In order to have a cause of action for wrongful dissociation, the provision in the agreement allegedly breached must be an *express* provision.

**2. Withdrawal before expiration of a definite term.** Idaho Code section 53-3-602(b)(2) provides that a dissociation is wrongful if the partnership is for a definite term and a partner dissociates before the expiration of that term. In their third amended counterclaim, the MRI Entities alleged that "the MRIA partnership was formed for a definite term, in that the partners agreed to operate the partnership until at least 2015" and that "SARMC withdrew from MRIA before the expiration of the term." On August 6, 2010, Saint Alphonsus moved for partial summary judgment dismissing any claim for wrongful dissociation in the first claim for relief. In its supporting memorandum, Saint Alphonsus argued that the partnership was not for a definite term because the agreement specifically stated that its term was indefinite. In opposition to the motion, the MRI Entities argued that considering intrinsic and extrinsic evidence, the partnership was for a definite term. After briefing and argument, the district court granted the motion for summary judgment on the ground that the partnership agreement was for an indefinite term.

The MRI Entities argue on appeal that there was at least a jury question of whether the partnership agreement was for a definite term. The applicable provision in the partnership agreement stated that "the term of this Partnership shall end on the date which is within a reasonable time after the business of the Partnership is wound up and dissolved under Article 10." Article 10 provided that "the Partnership may be dissolved through the affirmative vote of seven-ninths (7/9) or more of the eligible votes of the Board of Partners," at which time the business would be wound up and the assets liquidated. Under the terms of the partnership

agreement, the business would not be wound up until, at some undefined time, seven-ninths of the partners voted to dissolve the partnership. That is not a definite term.

The MRI Entities contend that the duration of the business should be considered to be when the terms of the two limited partnerships ended, which was December 31, 2015, for MRI Center and December 31, 2018, for MRI Mobile. The problem with that argument is that there is no provision in the partnership agreement stating that those two limited partnerships are the exclusive business of the partnership.

The effective date of the MRI Associates partnership agreement was April 26, 1985. The stated purpose of the partnership was broader than operating an MRI scanner, whether fixed or mobile. Its purpose included acquiring and operating "medical diagnostic devices . . . and therapeutic devices," and it only stated that "[t]he *initial* diagnostic equipment to be acquired shall be a magnetic resonance imaging device."[7] (Emphasis added.) Although the partnership agreement contemplated forming a limited partnership, there was no restriction on the number of limited partnerships or the durations of those created. The MRI Center limited partnership had an effective date of August 2, 1985, and the MRI Mobile Limited partnership had an effective date of October 17, 1988. Thus, the duration of the business contemplated in the partnership agreement for MRI Associates did not provide a definite term for the partnership. The district court did not err in granting summary judgment on this issue.

**3. Withdrawal before the completion of the particular undertaking.** Idaho Code section 53-3-602(b)(2) also provides that a partner's dissociation is wrongful if the partnership is for a particular undertaking and the partner dissociates before the completion of the undertaking under specific circumstances. The MRI Entities also assert that the partnership agreement was for a particular undertaking. On March 22, 2010, the MRI Entities filed their third amended counterclaim. As the first claim for relief, they alleged:

> 63. SARMC's withdrawal from MRIA was a breach of an express provision of the Partnership Agreement (that specifically listed the instances in which a partner could rightfully withdraw).

---

[7] The purpose of MRI Associates was stated as follows:

> The purpose of this Partnership is to purchase, lease or otherwise acquire, finance, manage[,] operate, use, control, hold, sell and otherwise transfer medical diagnostic devices, equipment and accessories and therapeutic devices, equipment and accessories related to such diagnostic devices and equipment, together with buildings and other facilities associated therewith, and to transact any and all business matters incident thereto. The initial diagnostic equipment to be acquired shall be a magnetic resonance imaging device.

64.  Also, the MRIA partnership was formed for a definite term, in that the partners agreed to operate the partnership until at least 2015 (which date was later extended to 2023).  SARMC withdrew from MRIA before the expiration of the term.

65.  Defendants have waived or are estopped from claiming that the partnership was not extended to 2023 by their ratification of the extension.

66.  SARMC's withdrawal was wrongful, and amounts to wrongful dissociation under I.C. §§ 53-3-602 (b)(1) and (2).

They did not plead in their third amended counterclaim that the partnership was for a particular undertaking.  As a result, they did not argue that claim in response to Saint Alphonsus's motion for summary judgment, nor did the district court address it.  "This Court will not consider issues raised for the first time on appeal."  *Clear Springs Foods, Inc. v. Spackman*, 150 Idaho 790, 812, 252 P.3d 71, 93 (2011).

**B.**
**Judgment in Favor of Saint Alphonsus for the Value of Its Partnership Share.**

As mentioned above, on September 21, 2007, Judge McLaughlin entered a judgment awarding Saint Alphonsus a judgment against MRI Associates in the sum of $4.6 million as the value of its partnership share.  In the final judgment entered in this case, Judge Wetherell held that Saint Alphonsus was entitled to interest on that judgment from September 21, 2007.

**1.  Amount of the judgment.**  The MRI Entities contend on appeal that the award was erroneous in that it should have been based upon the provisions of the partnership agreement, pursuant to which the award would only have been $863,040.  The MRI Entities did not challenge the award in the first appeal.  As we held above, "The 'law of the case' doctrine . . . prevents consideration on a subsequent appeal of alleged errors that might have been, but were not, raised in the earlier appeal."  *Taylor*, 146 Idaho at 709, 201 P.3d at 1286.  The MRI Entities contend that this doctrine should not apply.

They assert that when this Court vacated the judgment in the first appeal, it necessarily nullified this award.  The judgment was vacated in the first appeal because of errors affecting the amount of the damages awarded to the MRI Entities.  The judgment awarded to Saint Alphonsus was not an issue.  The vacation of the judgment did not nullify Saint Alphonsus's judgment.

They also assert that this Court overturned the underpinnings of Judge McLaughlin's decision.  This assertion mischaracterizes his holding.  As mentioned above, the partnership

32

agreement included a provision stating that any hospital partner may withdraw for one of four reasons. Judge McLaughlin held that those four reasons expressly limited the reasons for withdrawal by a hospital partner and that Saint Alphonsus therefore violated an express provision of the agreement when it withdrew for a different reason. On appeal, we reversed on the ground that such provision did not expressly limit the right to withdraw and therefore withdrawal for some other reason was not wrongful. *Saint Alphonsus Diversified Care*, 148 Idaho at 487-88, 224 P.3d at 1076-77.

With respect to the valuation of the withdrawing partner's interest, Judge McLaughlin did not base his decision upon whether the withdrawal was rightful or wrongful. Rather, he held that the provision in the partnership agreement for valuing a dissociating partner's interest was limited to the withdrawal being for one of the four listed reasons. Section 6.1 of the partnership agreement listed the four conditions under which a hospital partner may withdraw and stated that the withdrawing hospital would only be entitled to receive for its partnership interest an amount equal to the balance in its capital account. Judge McLaughlin concluded, "The Court finds that considering the other evidence presented at trial along in conjunction with the language of the Partnership Agreement itself, the applicability of the buyout calculation in Article 6.1 is limited to those enumerated four (4) reasons for dissociation, which did not occur in this case." This Court's decision in the first appeal that the four listed reasons were not express limitations on rightful withdrawal in no way undermined Judge McLaughlin's decision that the partnership agreement's provision for calculating the price to be paid for the interest of the dissociating hospital partner was limited to the hospital dissociating for one of the four listed reasons. Because the MRI Entities did not challenge the judgment awarded to Saint Alphonsus in the first appeal, we will not consider their challenge to it in this appeal.

**2. Offsetting the two judgments.** The final judgment entered provides that Saint Alphonsus is awarded interest on its judgment from the day it was entered on September 21, 2007. In calculating the amount to be offset against the damages awarded to MRI Associates, Judge Wetherell included interest that had accrued on Saint Alphonsus's judgment. The MRI Entities contend that this was error. They argue that only the principal amount of Saint Alphonsus's judgment should have been offset against the award to MRI Associates.

Idaho Code section 28-22-104(2) sets forth "[t]he legal rate of interest on money due on the judgment of any competent court." "The plain language of Idaho Code § 28-22-104(2)

33

indicates that interest on a judgment must accrue at the statutory rate and that the provision applies to all judgments." *Roesch v. Klemann*, 155 Idaho 175, 178, 307 P.3d 192, 195 (2013). Therefore, the district court did not err in including accrued interest on Saint Alphonsus's judgment when calculating the sum it was entitled to have offset against the award to MRI Associates.

## C.
### IMI Facility in Eagle.

Saint Alphonsus dissociated from MRI Associates effective April 1, 2004, and the covenant not to compete in the partnership agreement expired on April 1, 2005. By April 2006, Saint Alphonsus had purchased for $11.2 million a one-half interest in the portion of IMI's business that operated MRI scanners, and in 2007 IMI opened a facility in Eagle, Idaho. The MRI Entities claimed that they were entitled to recover damages regarding the opening of the facility in Eagle on the basis that it constituted usurpation of a partnership opportunity. After the MRI Entities rested their case, Saint Alphonsus moved for a directed verdict dismissing the claim regarding the Eagle facility, and the district court granted that motion.

Pursuant to Idaho Code sections 53-3-603(c) and -404(b)(1), the partner's duty of loyalty to account to the partnership and to hold as trustee any profits derived from the appropriation of a partnership opportunity continues after dissociation only with regard to matters arising and events occurring before the partner's dissociation. In granting the motion for a directed verdict, the district court stated:

> The action in opening the Eagle facility is too remote in time from both the dissociation and the expiration of the non-compete obligation to find that damages, if found, may be awarded for the Eagle facility profits that might have been realized by the MRI entities or the profits Saint Alphonsus realized under a disgorgement theory.
> The mere fact that Eagle was discussed as a possible area of expansion is not sufficient to find that these alleged damages arose from, quote, "matters arising or events occurring before the partners dissociation as required by the statute."
> In a case like this, it would defeat the purpose of the statute to hold otherwise. It would, in effect, extend the non-compete obligation to matters that were mere expectancies as opposed to matters that were actual existing operations or opportunities that were under serious and active consideration or in which the parties have actually—had actually made legitimate investment-backed expectations into the facility.

The district court did not err in its analysis. The MRI Entities had about three years to establish a facility in Eagle after Saint Alphonsus dissociated, but they did not do so. The MRI Entities do not point to any evidence indicating that establishing a facility there would have been a multi-year project. The IMI Eagle facility did not even exist at the time of the first trial in this case. The eventual establishment of an MRI facility in Eagle by IMI under no stretch of the imagination could be construed as usurping a partnership opportunity of any of the MRI Entities.

## IV.
## Attorney Fees on Appeal.

Both sides seek an award of attorney fees on appeal pursuant to Idaho Code section 12-120(3). Idaho Code § 12-120(3) "grants the prevailing party the right to an award of a reasonable attorney's fee in 'any civil action to recover . . . in any commercial transaction.'" *Apple's Mobile Catering, LLC v. O'Dell*, 149 Idaho 211, 216, 233 P.3d 142, 147 (2010). The MRI Entities prevailed on the appeal, but they did not prevail on their cross-appeal. Since they prevailed in part and Saint Alphonsus prevailed in part, they are not entitled to an award of attorney fees. *KEB Enterprises, L.P. v. Smedley*, 140 Idaho 746, 755, 101 P.3d 690, 699 (2004).

## V.
## Conclusion.

We affirm the judgment of the district court. We do not award costs or attorney fees on appeal.

Chief Justice BURDICK, Justices J. JONES, HORTON and J. Pro Tem KIDWELL **CONCUR.**